ORSCHELN BROS. TRUCK LINES, INC., Barry S. Schermer, Trustee, Assignor & Carriers Traffic Service, Inc., Assignee, Plaintiffs/Petitioners,

v.

ZENITH ELECTRONICS CORPORATION f/k/a Zenith Radio Corporation, Defendant,

and

United States of America and Interstate Commerce Commission, Respondents.

No. 85 C 8638.

United States District Court, N.D. Illinois, E.D.

Dec. 8, 1988.

Joseph L. Steinfeld, Jr., Robert B. Walker, Sims Walker & Steinfeld, Washington, D.C., Allan E. Levin, Chicago, Ill., for plaintiffs/petitioners.

Keith G. O'Brien, Wheeler & Wheeler, Washington, D.C., John J. Van Zeyl, Zenith Electronics Corp., Glenview, Ill., for defendant.

Anton Valukas, U.S. Atty., Gail C. Ginsberg, Asst. U.S. Atty., Chicago, Ill., Robert S. Burk, Gen. Counsel, Ellen D. Hanson, Associate Gen. Counsel, Timm L. Abendroth, I.C.C., Washington, D.C., for respondents.

## MEMORANDUM AND ORDER

MORAN, District Judge.

Plaintiffs appeal from the decision by the Interstate Commerce Commission ("Commission" or "ICC") in *Zenith Electronics Corporation—Applicable Tariffs—Petition for Declaratory Order*, No. 40059 (July 29, 1987) ("the ICC opinion"). Plaintiffs seek to set aside and annul that order in whole or in part, while defendants and respondents seek affirmance. Currently pending before the court are cross-motions for summary judgment. We uphold the Commission's decision in part and reverse in part.

## FACTS

The plaintiffs/petitioners are as follows: Orscheln Brothers Truck Lines, Inc. ("Orscheln") operated as a motor common carrier, Barry S. Schermer ("Schermer") is the trustee in that firm's bankruptcy proceedings, and Carriers Traffic Service, Inc. ("CTS") is the present party in interest, having purchased the cause of action.

Between March 24, 1981 and August 16, 1983, Orscheln was hired by defendant Zenith Electronics Corporation ("Zenith") to transport 740 truckloads of television cabinets from the Zenith Electronics Corporation at Indiana's ("ZECI") manufacturing facility in Evansville, Indiana, to Zenith's assembly facility in Springfield, Missouri. The charges billed were calculated pursuant to Tariff ICC MWC 226, Item 10090 and Tariff 125–H, Item 578, which states that consignors must load and consignees must unload each shipment. Item 578 provides that at the time of shipment the consignor was to endorse on the bill of lading the notation "shipper load and count and/or consignee must unload." ZECI, as consignor, performed the loading and counting and Zenith, as consignee, performed the unloading in Springfield. These actions were consistent both with the industry custom and with ZECI/Zenith's own course of dealing. ZECI did not, however, endorse the applicable bill of lading with the notation required by Item 578, though Orscheln endorsed 345 bills of lading and 719 freight bills with the notation at issue. Zenith paid the amount charged.

Zenith found Orscheln's rates no longer competitive, and in December of 1981 it discontinued use of Orscheln in the transportation of cabinets from Evansville to Springfield. In January of 1982 Orscheln and Zenith agreed on a lower rate. Orscheln officials represented to Zenith that the negotiated rate had been properly filed with the Commission in Supplement 105 to Tariff ICC MWC 226–D and was therefore effective. Pursuant to the agreement Orscheln transported 51 truckloads of cabinets from Evansville to Springfield between January 22 and February 17, 1982. Though the negotiated tariff did not become effective until February 18, 1982, Orscheln billed Zenith at the agreed-upon rate and Zenith paid accordingly.

In September of 1982 Orscheln and Zenith agreed on a rate applicable to shipments of finished products from the

Springfield plant to various distributors. Prior to any actual shipments Orscheln officials again represented to Zenith that the negotiated rate had been properly filed, this time as OBTL 400, Item 971. Twenty shipments were thereafter tendered by Zenith to Orscheln between September 29 and November 12, 1982, for movement from Springfield to distributors. Though here the negotiated tariff never became effective, Orscheln billed Zenith at the agreed-upon rate and Zenith paid accordingly.

On October 19, 1983, Orscheln filed a Chapter 7 petition and plaintiff Schermer was appointed trustee. Schermer hired plaintiff CTS to conduct an audit of Orscheln's freight bills. CTS discovered that several bills of lading used during the 1981–1983 period were not endorsed by Zenith, as required by Item 578.[1] Notwithstanding the fact that Zenith actually loaded and unloaded the relevant shipments in conformity with industry custom that the shipper load and unload, CTS recomputed the charges under a different, higher tariff because Zenith failed to endorse the bill of lading. The audit also revealed that the negotiated rates forming the basis for Orscheln's bills and Zenith's payments were not published at the time the services were rendered. Orscheln then submitted undercharge statements to Zenith demanding payment of the difference between the higher charges and the previously billed rate. Zenith refused to pay.

### PROCEDURAL HISTORY

On October 11, 1985, Orscheln filed the instant action pursuant to 49 U.S.C. § 10701 et seq., for the collection of $175,-478.69 plus prejudgment interest for freight undercharges on numerous interstate shipments, as prescribed by the rele-

vant tariffs filed with the Commission. On January 23, 1986, Orscheln amended their complaint to show that CTS had purchased the cause of action and thereby became an assignee.

Zenith claimed that the collection of undercharges would constitute an "unreasonable practice" in violation of 49 U.S.C. § 10701(a). It moved to stay the action in this court pending the Commission's ruling on, first, whether the notation requirement in Orscheln's filed tariff was unreasonable, and, second, whether the unfiled negotiated rate between the parties was the effective rate. On March 7, 1986, this court granted the stay and referred the matter to the Commission.

On October 29, 1987, the Commission issued its opinion, holding that the notation requirement was unreasonable given the circumstances.[2] Several factors were isolated. First, the Commission concluded that Zenith had complied "substantially" with the tariff requirement by loading, counting and unloading. Second, it found that the accepted practice within the electronics industry is for the shipper and not the carrier to load, count and unload. Third, it noted that no loss or damage claim was filed which would have rendered the notation requirement relevant for liability purposes. And, fourth, it looked to the negotiations between the parties and found that both Zenith and Orscheln received the benefits for which they bargained.

The Commission also held that the collection of undercharges, where the rates were negotiated but not filed, would constitute an unreasonable practice. As is explained infra, the Commission had previously established criteria by which to ascertain whether a negotiated rate should be enforced. It concluded the criteria had been

---

1. A more detailed explanation of the way by which Item 578 requires the shipper to endorse the bill of lading is contained infra.

2. We are unable to determine the exact procedural hook on which the Commission hangs its decision. The relevant language is: "The issue before us here is whether the bill of lading notation requirement is a reasonable practice" (ICC op. at 6), and "Under these circumstances, the notation would serve no purpose, and re-

quiring it in order for Zenith to receive the rate would be unreasonable" (id. at 6–7). It may have concluded that the notation requirement rendered Tariff MWB 226–D, Item 10090 unreasonable, or that the collection of undercharges in the absence of the notation would have been an unreasonable practice. In either instance, this court follows the same procedure for review and the results would be identical on either peg.

met because Orscheln and Zenith had negotiated the rate originally billed and paid, and because Zenith had reasonably relied on Orscheln's representations as to the filing of both the rate which never became effective as well as that which was filed on February 18, 1982.

Orscheln has reduced its claim to $110,671.15 in recognition of the fact that it, as opposed to consignor, notated certain bills of lading. It concedes that notations by the carrier resulted in substantial compliance with the tariff requirement on bills amounting to $64,825.13. The claim is therefore composed of $67,403.48 in notation undercharges and $43,267.67 in filed rate undercharges.[3]

## THE STANDARDS OF REVIEW

Pursuant to the Administrative Procedure Act, § 10(e), we look to whether the Commission's conclusion is "(a) arbitrary, capricious, and an abuse of discretion, or otherwise not in accordance with law, or (b) unsupported by substantial evidence." 5 U.S.C.A. § 706 (1977). Our inquiry is basically limited to deciding "whether there is warrant in the law and the facts for what the Commission has done." *United States v. Pierce Auto Freight Lines,* 327 U.S. 515, 536, 66 S.Ct. 687, 698, 90 L.Ed. 821 (1946). We are particularly reluctant to second-guess the findings of administrative agencies created to employ expertise. *See, e.g., Atchison, Topeka & Santa Fe Railway v. Wichita Board of Trade,* 412 U.S. 800, 806, 93 S.Ct. 2367, 2374, 37 L.Ed.2d 350 (1973) ("Congress has ... delegated the enforcement of transportation policy to a permanent expert body and has charged it with the duty of being responsive to the dynamic character of transportation problems") (citations omitted).

The crux of this dispute is over the scope of the Commission's "unreasonable practice" jurisdiction. 49 U.S.C. § 10701(a) is the source for this authority:

A rate (other than a rail rate), classification, rule, or practice related to transportation or service provided by a carrier subject to the jurisdiction of the Interstate Commerce Commission under chapter 105 of this title must be reasonable.

49 U.S.C.A. § 10701(a) (West Supp.1985). This "unreasonable practice" jurisdiction permits the Commission to evaluate several aspects of transportation policy. The Commission invoked it here to ascertain whether the tariff and collection of undercharges were reasonable.

Orscheln contends that the Commission erred twice, first in determining that the notation requirement was unreasonable and second by ignoring the applicable filed rate.

We substantially defer to the Commission's findings of fact but strictly evaluate whether its application of law is consistent with the Interstate Commerce Act (the "Act"). In particular, this court emphasizes how the limits imposed by the Act's antidiscrimination purpose circumscribe the Commission's interpretation of its unreasonable practice jurisdiction. As the Supreme Court stated in *NLRB v. Brown,* 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965):

Reviewing courts are not obligated to stand aside and rubber stamp their affirmance of administrative decisions that they deem inconsistent with the statutory mandate or that frustrate the congressional policy underlying the statute. Such review is always properly within the judicial province, and courts would abdicate their responsibility if they did not fully review such administrative decisions ... [w]here, as here, the review is not a question of fact, but of judgment as to the proper balance to be struck between conflicting interests, "(t)he deference owned to an expert tribunal cannot be allowed to slip into judicial inertia

---

**3.** Plaintiffs' reply alleges that the filed rate undercharges are attributable not to the 71 truckload shipments described textually *supra,* but rather to "178 individually rated shipments which moved prior to the effective date of the involved tariffs." *Id.* at 3. We choose not to resolve this factual dispute at this time because, according to the plaintiffs, "there is no dispute as to the amount owed pursuant to the audit, [so] this correction should not prejudice any party." *Id.*

which results in the unauthorized assumption by an agency of major decisions properly made by Congress".

*Id.* at 291–92, 85 S.Ct. at 988 (citations omitted). "The federal courts have played an important role in ensuring that agency decisions are not arbitrary and capricious and are based upon the concerns which Congress intended the agency to consider." *Marcus v. Bowen,* 696 F.Supp. 364, 382 (N.D.Ill.1988). *See also INS v. Cardoza–Fonseca,* 480 U.S. 421, 107 S.Ct. 1207, 1220–21, 94 L.Ed.2d 434 (1987); *Chevron, U.S.A. v. National Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984),[4] *Mohasco Corp. v. Silver,* 447 U.S. 807, 825, 100 S.Ct. 2486, 2496, 65 L.Ed.2d 532 (1980); *United States v. Larionoff,* 431 U.S. 864, 873, 97 S.Ct. 2150, 2156, 53 L.Ed.2d 48 (1977). Thus the Commission's interpretation of its unreasonable practice jurisdiction might be found contrary to law were it to conflict with the Interstate Commerce Act. Our inquiry therefore looks to whether the Commission's factual determinations were supported by substantial evidence and whether the application of unreasonable practice jurisdiction is consistent with the requirement of the Act.

### DISCUSSION

As discussed hereinafter, the Interstate Commerce Act has, historically, had an antidiscrimination touchstone. Because of a Congressional concern, based upon objective experience, that the larger shippers could coerce discriminatory lower rates from carriers, the Interstate Commerce Act prohibited discrimination, required the filing of tariffs and involved the Interstate Commerce Commission in the monitoring of tariffs. The courts, recognizing the purposes of the Act, adopted the filed rate doctrine—no matter how plausible the reason advanced by the shipper for a lesser rate (including the fraudulent representations of the carrier that the lesser rate

controlled), the duly filed rate was the only legal rate. That doctrine necessarily required shippers themselves to monitor the applicable tariffs. With the advent of deregulation in 1980, with its proliferation of negotiated tariffs, the role of the Commission in monitoring tariffs when filed virtually disappeared. The filing requirements and the nondiscrimination objectives of the Act remained. One response to the change was the Commission's amelioration of the rigid filed rate doctrine by looking to the statutory requirement that practices be reasonable—the Commission asserted jurisdiction to determine in particular circumstances whether a rate was reasonable as applied. The Commission has, in effect, introduced equitable concepts into a legal system.

The filed rate doctrine, even in an era of deregulation, serves valuable functions consistent with the Act. First, the filing of rates furthers competition by enabling shippers to compare and use as a tool in negotiation both the prices of various carriers and also the rates a carrier is charging the shipper's competition. A shipper can complain to the carrier and the Commission were a particular carrier attempting to charge higher than the filed rate. Further, the filing of rates enables a shipper to alert the Commission to reasonableness questions, and the Commission to decide them after a dispute arises. The Commission's incorporation of equitable concepts cannot be interpreted so as to emasculate these other purposes.

Plaintiffs here insist that a filed tariff controls, that it must be followed without deviation, and that the Commission cannot ignore tariff requirements for any reason. Defendants (with the concurrence of the Commission) contend that the practicalities and equities control. We agree with the Commission to an extent—it does have jurisdiction to consider the equities in real world circumstances. But we also believe that the nondiscrimination objectives of the

---

**4.** *Cardoza–Fonseca* extensively discussed deference to administrative agencies in light of *Chevron. See Cardoza–Fonseca,* 107 S.Ct. at 1220, n. 29. In *Chevron* the Court recognized the deference due statutory interpretations by administrative agencies where Congress did not intend to answer the question at issue. *Cardoza–Fonseca* held that deference is inappropriate where the agency's interpretation is inconsistent with expressed congressional intent.

Act remain unimpaired and that the "unreasonable practice" jurisdiction exercised by the Commission must be exercised with the continuing validity of those objectives in mind. Accordingly, we uphold the Commission's decision respecting notation undercharges and reverse the Commission's decision respecting filed rate undercharges.

## I. *Notation Requirement*

Item 578 of Tariff ICC MWB 125–H provides that rates subject to the requirement that the consignor load and/or the consignee unload the shipment are also subject to the following provisions:

> (1) At the time of shipment, the consignor must endorse on the Bill of Lading and Shipping Order the notation "Consignor load and count and/or consignee must unload" the shipment, as the case may be.
>
> \*   \*   \*   \*   \*   \*
>
> (6) If the consignor fails to comply with the requirements of paragraph (1) herein ... the rate will not apply and rates otherwise published will be assessed.

Both sides concede that a significant number of the bills of lading failed to contain the shipper's load, count and unload ("SL & C") notation. Orscheln therefore claims that Item 578 renders MWB 226–D, Item 10090, inapplicable, and that a higher class rate applies.

### A. Commission Decision Supported by Substantial Evidence

▇ By staying the action in this court and moving instead before the Commission, the parties followed the instruction of the Seventh Circuit in *Western Transportation Co. v. Wilson and Company, Inc.,* 682 F.2d 1227 (7th Cir.1982):

> [I]t does not follow that the shipper is necessarily without a remedy in a case like this. A tariff provision has to be reasonable. See 49 U.S.C. § 10704(a). If it is not, it violates the statutes, and the Commission, either on its own initiative or on complaint, "shall take appropriate action to compel compliance with" the statute. 49 U.S.C. § 11701. If the notation requirement is, as it appears to

be, entirely pointless, the Commission can be expected to set aside this part of the tariff—thus knocking the props out from under Western's case—if asked to do so. Wilson should have done what Iowa Beef Processors, Inc., another of Western's customers, did when sued by Western in bankruptcy court on the very tariff in issue in this case—ask for a stay of the court proceedings and then ask the Commission to declare the notation requirement unreasonable.

*Id.* at 1231.

The Commission held that the notation requirement served no purpose, given the particular circumstances of the case. Since both sides agreed that, consistent with industry custom, the shipper did the loading and unloading, the Commission determined that Zenith was eligible for the published rate notwithstanding its failure to make the proper notations on the bill of lading. We agree with the Commission that the circumstances render the notation requirement unnecessary.

The notation requirement generally serves the function of allocating various burdens of proof. *Dublin Co. v. Ryder Truck Lines, Inc.,* 417 F.2d 777 (5th Cir 1969). The shipper's notation is an admission of the facts asserted on the bill of lading. With regard to the SL & C endorsement, the notation is particularly important:

> In a claim for loss or damage to goods, the claimant has the initial burden of proving delivery of a greater quantity of goods to the carrier than received.... *If no shipper load and count or similar notations appear on the face of the bill of lading,* that bill should establish the presumption that the damage or loss was not occasioned by "an act of the owner or shipper," and the carrier should have the affirmative burden of establishing that the loss or damage was, in fact, so caused. On the other hand, if the bill of lading contains shipper load and count or similar notations, it should create the presumption that the carrier has expressly disavowed any agreement as to the kind and quality of the goods received

and the loading thereof, and the claimant should be required to prove, by other evidence, the quantity and condition of the goods and that they were properly loaded.

R. Sigmon, Miller's Law of Freight Loss and Damage Claims, 99–117 at 285 (4th Ed.1974) (emphasis in original). Were portions of the Evansville–Springfield cargo damaged or lost, the absence of the SL & C notation would have required the carrier to overcome the presumption that it was responsible for the problem.[5]

But no claim for damage or loss was filed here and, hence, the Commission concluded that "[u]nder these circumstances, the notation would serve no purpose" (ICC op. at 6). The Commission found that the case was controlled by *Iowa Beef Processors, Inc. v. Western Transportation Company*, I.C.C. No. 37521F (September 14, 1981), and held:

> Zenith has complied substantially with the tariff requirements. Zenith loaded, counted and unloaded each shipment in fact, and the evidence is not disputed that it is the general practice with these commodities for the shipper to do so. Accordingly, shipper and carrier each received the benefit for which it bargained. The shipper obtained service at what it considered an affordable price, and the carrier obtained needed traffic. The rate reflected the fact that Zenith relieved Orscheln of loading, counting, and unloading duties. Under these circumstances, the notation would serve no purpose, and requiring it in order for Zenith to receive the rate would be unreasonable.

Plaintiffs maintain that "[o]ne is concerned here with *risk* and not claims," that because the shipper failed to supply the SL & C notation the carrier bore the risk of loss (pl.mem. of law in sup. of mo. for sum.jdgmt. at 10 (emphasis in original)).

We fail to see any reason to be concerned with such risk, given plaintiffs' admission that no additional insurance was purchased. We also fail to see why plaintiffs were saddled with any risk other than the remote possibility that they might not be able to prove that Zenith did the loading and unloading. As in the Commission litigation, both sides herein agree that Zenith actually performed the loading and the unloading (resp.stmt. of mat.facts at ¶ 43). Since Zenith concedes it loaded and unloaded, the presumption that the carrier is liable in the absence of the notation is irrelevant. The notation requirement is unreasonable because its only purpose has been to trap an unwary shipper. *See Standard Brands, Inc. v. Central R. Co. of N.J.*, 350 I.C.C. 555, 558–59 (1974) (holding the endorsement requirement an unreasonable "trap for the unsuspecting shipper" because it "had no bearing on the nature of the commodity being shipped or the service performed and the carriers performed no additional services because of the absence of this endorsement").

In other instances it is conceivable that a shipper in Zenith's position might try to deny its handling of the shipment, were it to lodge a claim. To do so, however, it would need to (1) forfeit its rights to the lower tariff rate; (2) overcome the presumption that it followed industry custom and explain why it deviated from it; and (3) commit perjury while trying to convince the trier of fact of a lie. That being the only scenario under which risk would be relevant in the absence of an insurance purchase, we find the Commission's conclusion that the notation requirement is unreasonable supported by substantial evidence. And given that all agree that Zenith did the loading and unloading, and that no claim was filed, the notation requirement herein was not called into play and could thus be

---

5. This is exactly the point made by Commissioner Simmons, dissenting in *Von Hoffman Press, Inc. v. Orscheln Brothers Truck Lines, Inc., Barry S. Schermer, Trustee*, MC–C–30014 (Dec. 2, 1987) at 6. He goes one step further, however, and argues that "the fact that no evidence of claims or additional insurance has been presented in this particular case is not relevant to the reasonableness of the requirement based on industry practice." *Id.* With this we disagree for the reasons stated *infra* and enunciated by the majority decision in *Von Hoffman* at 5 ("The long established precedent holds that a notation requirement is acceptable only if shown to have a reasonable purpose. *In this case* none has been demonstrated") (emphasis added).

characterized as "entirely pointless" within the meaning of *Western Transportation.*[6]

We agree with the respondents that *Winthrop Laboratories Division of Sterlin Drug, Inc. v. Dorn's Transportation, Inc.,* 325 I.C.C. 654 (1964) is inapposite. The Commission in *Winthrop Labs* evaluated the carrier's failure to notify the shipper of lower released-value rates and refused to consider it an unreasonable practice. Because both rates were "clearly and fairly published in the tariff" the shipper was charged with knowledge of the lower rate and therefore the carrier's failure to notify was not an unreasonable practice. 325 I.C.C. at 656–57. Plaintiffs invoke *Winthrop Labs* to buttress their claim that even in the absence of a loss or damage claim the higher rate should be enforced because the carrier assumed unlimited liability during the transportation. The notation here, however, merely establishes a rebuttable presumption while the "released" rate categorically releases the carrier from liability. Thus, even if the shipper in *Winthrop Labs* had loaded and unloaded the cargo, as did Zenith, the carrier would nonetheless have been liable. As we describe above, the SL & C notation, and its absence, establish only presumptions, the latter of which was easily overcome here.

### B. Commission Decision Not Contrary to Law

Plaintiffs contend that the use of industry custom to determine whether the background circumstances render the notation requirement unreasonable is contrary to law. They suggest that the use of industry custom to "vary the terms of a tariff" is in tension with the long-established "filed rate doctrine" which courts employ to enforce the antidiscrimination goal of the original Interstate Commerce Act. But use of industry custom does nothing to vary tariff terms and, because it will not

foster discrimination, does not run afoul of the filed rate doctrine. To come to this conclusion, we look into the original basis for the doctrine.

The Interstate Commerce Act's antidiscrimination purpose was codified in 49 U.S. C. § 10761(a):

> Except as provided in this subtitle, a carrier providing transportation or service subject to the jurisdiction of the Interstate Commerce Commission under chapter 105 of this title shall provide that transportation or service only if the rate for the transportation or service is contained in a tariff that is in effect under this subchapter. That carrier may not charge or receive a different compensation for that transportation or service than the rate specified in the tariff....

The Supreme Court has enforced this provision through the filed rate doctrine, holding that "the rate of the carrier duly filed is the only lawful charge. Deviation from it is not permitted upon any pretext." *Louisville & N.R.R. v. Maxwell,* 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915). This rigid rule has been applied even in instances where the shipper relies on a carrier's misrepresentations that a particular rate, as distinguished from the filed tariff, is applicable. *See, e.g., id.* at 97, 35 S.Ct. at 495 ("Ignorance or misquotation of rates is not an excuse for paying or charging either less or more than the rate filed").

Plaintiffs urge this court to apply the filed rate doctrine to the Evansville–Springfield shipments. They argue that the bill of lading notation is a condition precedent to the application of Tariff 125–H and that, in the absence of the SL & C notation, the filed rate doctrine compels the higher rate be applied. The Commission instead held that "[b]ecause the notation requirement itself is unreasonable under 49 U.S.C. 10101(a), further discussion of the filed rate doctrine and equitable defenses is unnecessary" (ICC op. at 7).

---

**6.** In holding the use of industry custom as relevant to the reasonableness inquiry, we believe that the procedural effect of the SL & C notation—to distribute the burdens of proof in damage or loss claims—can be accomplished through other means. Where the industry cus-

tom is for the shipper to count and load, the burden is on the carrier to demonstrate otherwise in the particular instance. This saddles the carrier with the same burden created by the SL & C notation.

### 1. *Tariffs Can Be Unreasonable as Applied*

The Commission's decision did not state that the notation requirement was categorically unreasonable—its ruling was considerably more narrow. It only held that in those circumstances where the notation "would serve no purpose" (ICC op. at 6), it would be unreasonable to consider the notation requirement a condition precedent to the tariff's application. Thus the collection of undercharges, based on the higher rate, would be an unreasonable practice given the circumstances at bar.

█ No one contends that the Commission cannot make general pronouncements as to the reasonableness of particular rates or practices outlined in tariffs. For example, it could and often does declare a certain tariff unreasonable because of ambiguity. Plaintiffs contend that because the Commission's decision only decided the reasonableness of the notation requirement given the circumstances here, the filed rate doctrine compels the collection of undercharges—that unless all provisions of Tariff 125–H are met the higher rate must apply. They look to *Farley Transportation Co. v. Santa Fe Trail Transportation Co.*, 778 F.2d 1365 (9th Cir.1985), for support.

In *Farley*, the Ninth Circuit upheld the district court's holding that referral to the Commission was unnecessary where the referring party admitted that the tariff was unambiguous and reasonable on its face (*id.* at 1371). Although here the Commission has issued an advisory opinion, this court is no less capable of rendering the same type of legal decision made by the Farley district court. We are guided by the Seventh Circuit's decision in *Western Transportation Co., supra.* The court there held that while the tariff at issue was

unambiguous, the plaintiff could still challenge the reasonableness of the tariff's notation requirement before the Commission. 682 F.2d at 1232. The court suggested that the plaintiff ask the Commission to declare the notation requirement unreasonable, as it did for Iowa Beef Processors, Inc. in a prior dispute (*id.* at 1231). What is notable is that the Commission's decision in *Iowa Beef Processors, Inc. v. Western Transportation Co.*, ICC Docket No. 32521F (Sept. 14, 1981), did not declare the notation requirement unreasonable on its face, but instead found that the particular facts rendered the notation requirement unreasonable as applied:

As to the reasonableness of the endorsement requirement, we agree with the conclusions reached by the ALJ. The *Standard Brands* principle applies here. There the Commission held that a shipper is bound by such a provision, but found on the particular facts that to apply such a provision would be unreasonable.

\*        \*        \*        \*        \*        \*

Since the consignor loading and consignee unloading is the norm in transporting the involved meats, application of a bill of lading endorsement requirement to rates for such products is unwarranted. Thus, applying the *Standard Brands* principle here is entirely proper.

*Id.* at 3.[7] So the law in this circuit permits the Commission to declare a particular tariff or tariff provision unreasonable, as applied to the circumstances of the case. *See also Carriers Traffic Service v. Anderson, Clayton & Company, et al.*, 691 F.Supp. 151 (N.D.Ill.1988) (upholding the Commission's determination that application of a higher rate would be unreasonable given the circumstances); *Inman Freight Sys-*

---

**7.** The Seventh Circuit's invocation of *Iowa Beef* is strong evidence that the Ninth Circuit's *Farley* decision inadequately distinguished *Western Transportation.* In *Farley* the court held that "[i]n that case [*Western Transportation*], there is no indication that the court or Wilson considered the tariff to be reasonable on its face. In fact, the opposite is true; the court suggested that Wilson challenge the reasonableness of the tariff's notation requirement, and we interpret the opinion's 'as applied' language in that context." 778 F.2d at 1371. We believe that the "as applied" language should be interpreted in the context of *Iowa Beef,* the rationale therein being that the reasonableness of the notation requirement should be evaluated in light of the circumstances pursuant to *Standard Brands.*

*tems v. Boise Cascade Corporation, et al.,* 691 F.Supp. 146 (N.D.Ill.1988) (same).

■ Furthermore, we look to the original purpose of the filed rate doctrine to prevent wooden application of it:

This rule is undeniably strict, and it obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress in the regulation of interstate commerce in order to prevent unjust discrimination.

*Maxwell,* 237 U.S. at 97, 35 S.Ct. at 495; *see also Armour Packing Co. v. U.S.,* 209 U.S. 56, 81, 28 S.Ct. 428, 435, 52 L.Ed. 681 (1908) ("If the rates [filed and published as required by law] are subject to secret alteration by special agreement, then the statute will fail of its purpose to establish a rate duly published, known to all, and from which neither shipper nor carrier may depart"). Thus the unreasonable practice jurisdiction of the Commission is limited by the filed rate doctrine only where the Commission's holding would foster discrimination—the evil addressed by both the doctrine and the Act. Were such a showing made, the Commission would not be able to contend that "[b]ecause the notation requirement itself is unreasonable under 49 U.S.C. 1070(a) [10701(a)], further discussion of the filed rate doctrine and equitable defenses is unnecessary" (ICC op. at 7). Instead, this court would be duty-bound to reverse the Commission's determination. With regard to the notation requirement, however, we fail to see how reviewing who actually performed the loading and unloading would either be contrary precedent or foster the type of discrimination to which the Interstate Commerce Act was addressed.

### 2. *Use of Industry Custom Not Contrary to Law*

■ Plaintiffs invoke *Atlantic Coast Line R. Co. v. Clinchfield Fuel Co.,* 94 F.Supp. 992 (W.D.S.C.1951), for the proposition that "it has long been held that 'cus- tom' is not admissible to vary the terms of a tariff" (pl.mem. at 16). We find that contention without merit. First, *Atlantic Coast* refers not to industrywide custom, but rather to the course of dealings between the parties. The latter is manipulable by the carrier and shipper, but the former is not. Second, including industry custom among the circumstances reviewable by the Commission in ascertaining whether awarding particular undercharges would constitute an unreasonable practice is different from "varying the tariff." The Commission's power to review the reasonableness of practices derives from 49 U.S. C. § 10701(a), not from the antidiscrimination powers enunciated in § 10761(a). The Commission's power to interpret its unreasonable practice jurisdiction is limited only in those instances in which the interpretation runs afoul of the Act itself. Thus, as is explained *infra,* the Commission's use of custom is contrary to law only where it can be demonstrated that discrimination would be fostered.

■ Plaintiffs do attempt to make such a demonstration. They argue that the lower rate is made possible only by the notation requirement's shifting of the burden of proof in claim proceedings. Thus, if "custom" is considered relevant, shippers who customarily load and count will receive the benefits of the lower rate even without the requisite notation, while others for whom loading and counting is unusual will not receive the lower rate without considerable additional proof. We find this analysis unpersuasive.

First, this is not the form of discrimination to which the Act was addressed. The Act attempted to achieve uniformity in freight transportation charges in an effort to eliminate the discrimination and favoritism that plagued the late 19th century railroad industry. *See So. Pacific Trans. Co. v. Commercial Metals Co.,* 456 U.S. 336, 343–44, 102 S.Ct. 1815, 1820–21, 72 L.Ed.2d 114 (1982).[8] "It cannot be challenged that

---

**8.** *See also Delta Traffic Service, Inc. v. Georgia– Pacific Corporation,* 684 F.Supp. 769, 770 (D.Conn.1987) ("The reason for this rule was Congress' desire to eliminate secret discounts and preferential treatment for big shippers"); *Oneida Motor Freight, Inc., et al. v. Felsway Corporation,* 86 B.R. 344, 348 (Bankr.D.N.J. 1987) ("it is the prevention of collusion between

the great purpose of the Act to regulate commerce, whilst seeking to prevent unjust and unreasonable rates, was to secure equality of rates as to all and to destroy favoritism, these last being accomplished by requiring the publication of tariffs and by prohibiting secret departures from such tariffs, and forbidding rebates, preferences, and all other forms of undue discrimination." *New Haven R.R. v. I.C.C.*, 200 U.S. 361, 391, 26 S.Ct. 272, 276, 50 L.Ed. 515 (1906). "Among other things that Congress was concerned with ... was the 'evil' of big shippers getting secret discounts from railroads." *Western Transportation*, 682 F.2d at 1230 (citations omitted). The scenario foreshadowed by the plaintiffs contemplates the benefitting of particular shippers, not based on their size or relationship with the carrier but, rather, based upon their chosen method of allocating the responsibility during shipping. This is a far cry from the evil contemplated by the Act—the favoritism showed large shippers by carriers who discriminated against smaller shippers by not offering them comparable rates for identical services.

Second, plaintiffs seem to be confusing "industry custom" with "course of dealing." The former is unalterable by individual market participants, the latter manipulable by the parties. The scenario envisioned by the plaintiffs concludes that a particular "group of shippers (those who do not customarily load and count their own freight but will do so in consideration of a lower rate) will not be able to take advantage of the lower rate unless they notate the applicable bills of lading" (pl.mem. at 18). But the policies of any individual or group of shippers are irrelevant; industry custom alone—and there will be by definition only one—supplies the appropriate presumption. With full knowledge of the custom any individual shipper, no matter its size, can available itself of the benefits and protections afforded thereby. Here shippers will be the beneficiaries of a presumption that, in conformity with industry custom, they loaded and unloaded. An individual shipper may, if it prefers, seek to conduct business in a manner contrary to the industrywide custom, but since conformity and non-conformity with industry custom is available to all shippers, we find no discriminatory effect from including custom in the set of circumstances to be reviewed in ascertaining whether the notation requirement is reasonable.

Finally, both rates at issue are published and are therefore available to small and large shippers—the dispute is over which of two published tariffs is applicable to the 1981–83 shipments between Evansville and Springfield. Zenith contends that the applicable rates were contained in MWB 226–D, Item 10090. Orscheln argues that Zenith's failure to make the appropriate notation on the bill of lading renders the above tariff inapplicable and that a higher class rate applies. Since both rates are contained in published tariffs the Commission's consideration of industry custom does nothing to deprive either large or small shippers from using published rates.

In the absence of persuasive evidence that discrimination will be fostered by including industry custom in the circumstances reviewable by the Commission, we hold that the Commission's interpretation of its unreasonable practice jurisdiction is not contrary to law.

## II. *Negotiated Rates*

■ We turn now to the legal relevance of negotiated but unfiled rates. As previously described, the dispute in this case concerns the bounds of the Commission's unreasonable practice jurisdiction. One court has described the judicial role as follows:

> The court is therefore required to determine the extent to which the filed rate doctrine is modified by the defense that collection of the undercharge would be an unreasonable practice within the meaning of 49 U.S.C. § 10701(a).

a shipper and a carrier and the prevention of the creation of secret rates which are against the public interest that is the underlying principle

behind the case law that preserves the sanctity of the published tariff").

*In re Total Transportation, Inc.,* 84 B.R. 590 (D.Minn.1988).[9] We, however, are willing to look beyond merely the letter of the filed rate doctrine's prohibition of equitable defenses. Instead, as done *supra* with respect to the notation requirement, we evaluate whether the Commission's decision will foster discrimination.[10]

A. The ICC's Opinion and MC–177

As recently as 1985 the Commission refused to interpret its unreasonable practice jurisdiction in ways that would allow the assertion of a negotiated but unfiled rate as a defense to a suit for undercharges. *See Atlas Foundry and Machine Co. v. IML Freight, Inc.,* ICC Docket No. MCC–10942 (May 16, 1985), *cited in* Goodman, *Unfiled Motor Common Carrier Rates Gain New Respectability as the ICC Celebrates its Centennial ("Unfiled Rates"),* 54 Transp.Pract.J. 292, 302 (1987). In 1986, however, the Commission reversed its course. In *National Industrial Transportation League—Petition to Institute Rulemaking on Negotiated Motor Common Carrier Rates: Ex Parte No. MC–177,* 3 I.C.C.2d 99 (1986) ("MC–177"), the Commission announced that it would in some circumstances employ its unreasonable practice jurisdiction under 42 U.S.C. § 10701(a) to reduce the ability of carriers to bring suits for undercharges. In MC–177 the Commission contended that the Motor Carrier Act of 1980, Pub.L. No. 96–296, 94 Stat. 793, "dramatically altered the competitive atmosphere of the motor carrier industry." 3 I.C.C.2d at 105. The Commis-

sion attributed the dramatic increase in the use of negotiated but unfiled rates to the deregulation of many entry and expansion restrictions by the Motor Carrier Act. *Id.* The Commission noted that "hundreds, or even thousands, of individual motor common carrier rates are negotiated daily. In these circumstances, it can be extremely difficult for shippers to determine, prior to movement, whether the agreed rate is actually on file." *Id.*

Thus the Commission announced that it would issue advisory opinions to courts from whom cases were referred. In those opinions the Commission would evaluate the circumstances to determine whether the shipper should be entitled to assert the negotiated rate as an equitable defense to a claim for the collection of undercharges:

> We would, at a court's request, determine, based on all relevant circumstances, whether the collection of undercharges based on the rate contained in the filed tariff would constitute an unreasonable practice and, if a negotiated rate is found to exist, whether this amount is all the carrier should be permitted to collect.

3 I.C.C.2d at 107. The Commission outlined the criteria under which it would enforce the unfiled negotiated rate:

> A decision in favor of the shipper under the *Negotiated Rates* precedent requires two basic findings: (1) that a rate other than the tariff rate was quoted by a carrier representative upon whom the shipper could legitimately rely and that an agreement to use that rate was

**9.** The *In re Total Transportation, Inc.* decision was admittedly at a different stage of the litigation than this case. The court therein decided that referral to the Commission under the doctrine of primary jurisdiction was inappropriate because the tension between the use of negotiated rates and the filed rate doctrine is a legal, not factual, dispute. "It is enough for the court to note that because it is bound by both statute and Supreme Court precedent to apply the filed rate doctrine it would be unable to accept any advisory opinion by the ICC that a shipper be permitted to avoid the filed rate doctrine through assertion of equitable defenses." *Id.* at 598. But the reasoning employed therein is equally applicable to the question of whether the Com-

mission's use of negotiated rates in the case at bar was contrary to law.

**10.** Just as we are unwilling to apply the filed rate doctrine without question to supersede the Commission's unreasonable practice jurisdiction, we similarly refuse to dismiss those cases merely because they "all antedate the Commission's policy statement in *Negotiated Rates* [MC–177] and simply do not address the ICC's 'reasonable practice jurisdiction.'" (Mem. in sup. of resp. cross-mo. for sum. jdgmt. at 18.) We instead look to the evil to which the filed rate doctrine is addressed and ascertain whether the Commission's invocation of its unreasonable practice jurisdiction would frustrate the doctrine's goals given the particular circumstances.

reached; and (2) that the shipper reasonably relied on the quote.

(ICC op. at 8.)

The Commission found both that Orscheln's senior officials negotiated two sets of rates below the filed tariff rate, and also that there was sufficient "evidence of an offer, mutual acceptance by the parties, performance and payment of consideration" (ICC op. at 9). Therefore, as to the 20 shipments of finished products paid for at the negotiated rate, the Commission held that "it would be an unreasonable practice to allow respondent to collect the undercharges based on the tariff rate." *Id.* The Commission then turned to the remaining 51 shipments of television cabinets from Evansville to Springfield, billed and paid at the rate specified in a tariff not yet effective at the time of transportation. The Commission found that Orscheln's billing at the subsequently filed rate and petitioner's payment of those charges was strong evidence that the rate in question was actually negotiated. *Id.* Orscheln's mere denial of Zenith's explanation was insufficiently credible to deny that the rate had been agreed upon and that Zenith had good reason to believe the rate was actually filed. *Id.* The conclusion with regard to the television cabinet shipments was that "[i]t would be an unreasonable practice for respondent to collect the tariff rate for the

shipments based upon the mutually negotiated reduction in rates entered into between petitioner and two senior Orscheln officials." *Id.* at 10.

### B. ICC's Opinion Contrary to Law

■ Succinctly stated, the issue here is whether the application of MC–177 to the circumstances here is contrary to the terms and goals of the Interstate Commerce Act as protected by the filed rate doctrine.[11] We find that MC–177 is fundamentally flawed in that it can foster discrimination both by removing the incentive of shippers to ascertain whether the negotiated rate has been filed and also by inducing carriers to be less vigilant in filing the rate with the Commission. Thus the Commission's interpretation of its unreasonable practice jurisdiction is contrary to law because that interpretation conflicts with the purpose of the Act.

As previously described, MC–177 requires only (1) that a rate other than the tariff rate was quoted by a carrier representative upon whom the shipper could legitimately rely and that an agreement to use that rate was reached; and (2) that the shipper reasonably relied on the quote. In this case the Commission's factual findings—which answer these queries—are supported by substantial evidence,[12] but we inquire further into the effects of MC–177.

11. We take this opportunity to describe the various procedural postures from which district courts have evaluated the Commission's authority. The majority of cases have discussed MC–177 when deciding whether to refer to the Commission's determination as to the reasonableness of undercharge collection. The logic of these cases is relevant because they consider the same legal issues we are deciding here—whether the Commission's advisory opinion, if it held that the collection of undercharges would be unreasonable, would be contrary to law. If the courts so conclude, they don't bother asking the Commission's opinion and instead usually grant summary judgment for the plaintiffs. Other courts have waited until after the Commission issues its opinion to evaluate whether its conclusions are contrary to law. Those cases look at the analysis provided by the Commission in the particular case. We invited the Commission to furnish us with analysis specifically applicable to the case here. Now we decide whether those conclusions are supported by substantial evidence and/or contrary to law.

12. In light of the conflicting case law on MC–177, we take this opportunity to find that the Commission's factual findings *re* the negotiated rates were supported by substantial evidence. With respect to the 20 shipments of finished products, Orscheln did not contest Zenith's showing that the $4.25 per cwt rate was negotiated and agreed upon. And with respect to the 51 shipments of television cabinets, substantial evidence supports the ICC's finding that the rate was negotiated and relied upon. Zenith's evidence from a former employee named specific senior officials of Orscheln, dates and locations of the alleged negotiations. And it is undisputed that Orscheln billed petitioner at the subsequently-filed rate. The Commission's ruling that Orscheln's mere denials, without additional evidence in general or from the named senior officials in particular, were less credible than Zenith's demonstrations surely was supported by substantial evidence.

### 1. *Filed Rates*

The problem is that MC–177 effectively removes the shipper's obligation to ascertain whether the negotiated rate was actually filed. It is settled law that this obligation derives directly from 10761(a)'s requirement that all rates charged must be pursuant to a filed rate which cannot be changed without Commission approval.

The Commission has contended that MC–177 does not remove the carrier's legal obligation to file the rate with the Commission, nor the shipper's obligation to ascertain whether the rate was actually filed. But MC–177 removes the teeth from these requirements. For example, the inability of a shipper to enforce agreements that contravene the filed rate serves as "a deterrent weapon in the enforcement of the statute and the public policy which underlies it." *Bowser & Campbell v. Knox Glass, Inc.*, 390 F.2d 193 (3d Cir.1968), *cert. denied*, 392 U.S. 907, 88 S.Ct. 2061, 20 L.Ed.2d 1365 *quoted in Unfiled Rates* at 295. Leonard S. Goodman, former associate general counsel to the Commission and author of *Unfiled Rates*, keenly observes that "as a practical matter, from the standpoint of the shipper, the size of the undercharge will increase more or less in proportion to the size of the shipper, so that the shipper can readily weigh the cost of checking for a filed tariff against the risk of paying the undercharge." *Unfiled Rates* at 299. MC–177, by reducing the risk of paying the undercharge, removes the incentive for larger shippers to check for the filing of the negotiated tariff.

Knowing that to be the case, and also in an effort to maintain a higher rate for shipments from other shippers, the carrier may be lax in actually filing. "Enforcing the agreed rate over the published rate undermines the strong antidiscriminatory policy of the statute that requires the common carrier to follow the tariff-filing steps prior to engaging in the transportation service." *Id.* The otherwise strict adherence to the filed rate doctrine has been softened only after courts have concluded that discrimination would not be promoted. *See, e.g., Iowa Power and Light Co. v. United States*, 712 F.2d 1292, 1295 (8th Cir.1983), *cert. denied*, 466 U.S. 949, 104 S.Ct. 2150, 80 L.Ed.2d 536 (1984) ("it is clear that the Commission's action in the present circumstances does not conflict with that [the antidiscrimination] underlying purpose").[13]

■ Unfortunately, we are unable to glean from existing case law a consistent theory because prior judicial treatment of the conflict between the filed rate doctrine and MC–177 has been inconsistent. The Supreme Court has no on-point pronouncements, and among the courts of appeals only the Eleventh Circuit has closely analyzed the issue. In *Seaboard System R.R. Inc. v. United States*, 794 F.2d 635 (11th Cir.1986), the court affirmed the Commission's refusal to enforce a railroad's tariff rate in circumstances where the shipper had relied on the carrier's representation that a significantly lower rate would legally apply. In particular, the court held that the Commission was able to prohibit the collection of undercharges pursuant to its unreasonable practice jurisdiction. 794 F.2d at 638. This decision, unfortunately, is much less helpful than it would first appear. The tariff at issue in *Seaboard System* was one "whose meaning is not plain to the ordinary user." *Id.* at 637. This ambiguity is relevant insofar as it goes directly to the shipper's ability to fulfill its obligation to ascertain whether the rate billed was actually filed. Here Zenith does not allege any tariff ambiguity. *See also Delta Traffic Service, Inc. v. Georgia–Pacific Corporation*, 684 F.Supp. at 771 ("The case at bar, of course, does not involve a confusing tariff"). In such circumstances we cannot excuse the shipper's failure to perform its legal obligation because doing so would remove an important

---

13. We wonder about the United States' contention that "Petitioners' 'policy' would discriminate among shippers based upon their care and prudence in reading rate tariffs and choosing carriers upon which to rely" (res.mem. at 20). Put another way, the policy to which the government objects would discriminate in favor of shippers who use care and prudence in following the law. That policy is at the core of the Act. It is peculiar that the United States would marshall this analysis in the midst of an otherwise thoughtful argument.

legal weapon ensuring that the antidiscrimination purpose of filing rates is achieved. Secondly, *Seaboard System* reviewed a Commission order issued as a result of an administrative complaint filed by the shipper with the Commission. The court therefore decided only that the Commission had authority to permit equitable defenses in administrative complaint proceedings. Here, however, the Commission's review is pursuant to a referral from a district court. Finally, we are concerned that the Eleventh Circuit did not reconcile the tension between the Commission's unreasonable practice jurisdiction and the antidiscrimination focus of the Interstate Commerce Act. *Seaboard System* merely deferred to the Commission's determination that the inability of a shipper to rely on a carrier's interpretation of a tariff is a greater evil than the older remote possibility of intentional misquotes. That conclusion is legally irrelevant. There is no statutory or common law basis for what the court seems to regard as the shipper's "right" to rely on the carrier's representations. We find it problematic, therefore, that the Eleventh Circuit was willing to acquiesce to the Commission's subordination of the Act's principal focus to the convenience of shippers. To the extent that our holding is inconsistent with *Seaboard System,* we respectfully disagree.

The Seventh Circuit has addressed the issue only tangentially in *Western Transportation Company, supra.* The court therein firmly endorsed the filed rate doctrine, in full recognition of the harsh consequences which inevitably result. The court held the tariff, which contained a load and unload notation requirement, to be unambiguous and that therefore the suit for undercharges was appropriate. *Id.* at 1231. But the court permitted the shipper thereafter to plead that the notation requirement was unreasonable as applied to the circumstances. *Id.* at 1232. By suggesting this alternative and favorably invoking the Commission's holding that a similar notation requirement was unreasonable in *Iowa Beef Processors, Inc., supra,*

the Seventh Circuit's decision might be interpreted to imply that MCC–177 is consistent with the Interstate Commerce Act. But since that court has not addressed the issue directly, and because we feel that the tension is a very real concern heretofore only vaguely discussed, this court does not feel bound to follow what was only insinuated.

Bankruptcy and district courts have split on the issue of whether MC–177 is contrary to law. Some courts, believing MC–177 consistent with the filed rate doctrine because it does not alter the legal requirement that the rate be filed, have referred cases to the Commission. *See, e.g., Maislin Industries, U.S., Inc. v. Primary Steel, Inc.,* 705 F.Supp. 1401, 1406 (W.D.Mo.1988) ("the ICC's change in policy and consideration of equitable defenses in the instant case was justified and consistent with its 'practices' jurisdiction under the Interstate Commerce Act"); *In re Tucker Freight Lines, Inc.,* 85 B.R. 426, 429 (W.D.Mich. 1988) ("it appears to this Court that the ICC does indeed have authority to determine whether collection of undercharges would be an unreasonable practice"); *Younger Transportation, Inc. v. TMBR Drilling, Inc.,* MO–85–CA–20 (W.D.Tex., Sept. 23, 1987) at 5 ("It is not a reasonable practice for defendant Younger to collect the tariff base rate other than the negotated rate for the shipment described in this proceeding"); *Motor Carrier Audit & Collection Co. v. Family Dollar Stores,* 670 F.Supp. 644, 649 (W.D.N.C.1987) ("it is clear, however, that this court, without the administrative advice of the ICC, cannot in this undercharge case entertain any equitable defenses"); *Christison v. Caterpillar, Inc.,* 74 B.R. 373, 377 (Bankr.C.D. Ill.1987) (trustee's undercharge claims "are at the heart of the ICC's authority and, in the interest of uniformity should be initially heard by the ICC"); *Breman's Express Co. v. H & H Distributing Co.,* 69 B.R. 356, 359 (Bankr.W.D.Pa.1987) ("the issue presented before us must first be referred to the ICC, so that we might be aided in our final determination by that agency's

special competence and expertise").[14]

Others have refused referral or otherwise declared MC–177 contrary to law because they considered it merely another attempt to permit equitable defenses in violation of the filed rate doctrine. *See, e.g., Motor Carrier Audit & Collection Co. v. Baldor Electric Company,* CA3–85–2002–AH (N.D.Tex. July 27, 1988) at 12–13 ("the fact that Congress in the Motor Carrier Act of 1980 established a new policy to promote a competitive and efficient motor carrier industry ... is insufficient to overturn long standing Supreme Court construction of the 'filed rate' doctrine"); *Delta Traffic Service, Inc. v. E.L. Mustee & Sons,* Civil Action No. C87–1726, [1988 WL 156135] (N.D. Ohio, May 12, 1988) ("until Congress or at least the Sixth Circuit decides differently, the Court has no choice but to enforce the published tariffs, at least where no ambiguity exists. Therefore, referral to the ICC would be a pointless exercise"); *In re Total Transportation, Inc.,* 84 B.R. at 598 ("because it is bound by both statute and Supreme Court precedent to apply the filed rate doctrine it would be unable to accept any advisory opinion by the ICC"); *Delta Traffic Service, Inc. and Oneida Motor Freight, Inc. v. Georgia–Pacific Corporation,* 684 F.Supp. at 771 ("holding referral inappropriate because '[t]he Court is simply not persuaded that the general requirement of maintaining reasonable practices can contravene the specific requirement that rates must be filed and that no deviations are permitted from those rates' "); *Feldspar Trucking Company, Inc. v. Greater Atlanta Shippers Association, Inc.,* 683 F.Supp. 1375, 1377 (N.D.Ga. 1987) (denying referral to the ICC because "[t]he tariff is unambiguous and may be applied without the aid of the ICC"s expertise"), *interlocutory appeal denied,* 849 F.2d 1389 (11th Cir.1988); *Motor Carrier Audit & Collection Co. v. United Food Service, Inc.,* Civil Action No. 87–C–2898 (D.Colo. May 4, 1987) at 4 [1987 WL 19008] (refusing to apply the primary jurisdiction doctrine because of "clear precedent establishing that equitable defenses are not generally available"). *See also Yaquinto v. Supreme Beef Processors, Inc.,* Civil Action No. 3–87–2274–R (N.D.Tex. Jan. 20, 1988) [1988 WL 79493]; *Delta Traffic Service, Inc. and Oneida Motor Freight, Inc. v. Cuisinarts, Inc.,* Civil Action No. H–87–424 (D.Conn. Oct. 28, 1987; *Delta Traffic Service, Inc. and Oneida Motor Freight, Inc. v. Personality Plastics, Inc.,* Civil Action No. CV–87–2323 (E.D.N.Y. Oct. 7, 1987); *Delta Traffic Service, Inc. and Oneida Motor Freight, Inc. v. Keystone Lighting Corporation,* Civil Action No. 87–3659 (E.D.Pa. Sept. 24, 1987); *Delta Traffic Service, Inc. and Oneida Motor Freight, Inc. v. Occidental Chemical Corporation,* Civil Action No. 87–4217 (E.D.Pa. August 18, 1987); *In re Taynton Freight Systems,* 76 B.R. 971 (Bankr.M.D. Pa.1987); *West Coast Truck Lines, Inc. v. Kaiser Aluminum & Chem. Co.,* No. C–87–0048 (N.D.Cal. July 28, 1987) [1987 WL 46871]; *Transportation International. Inc. v. Douglas 7 Lomason Company,* No. 86–CV–73996–DT (E.D.Mich. July 9, 1987); *Cooper v. California Consolidated Enterprises, Inc.,* 78 B.R. 773 (Bankr.W.D.N.C. 1987).

This is true of certain decisions within this jurisdiction. *See Motor Carrier Audit & Collection Co. v. Portion Packaging, Inc.,* 683 F.Supp. 202, 203 (N.D.Ill.1988) (Bua, J) ("In light of the filed rate doctrine, referral of this case to the ICC would serve no purpose"); *see also Motor Carrier Audit and Collection Co. v. Medline Industries, Inc.,* Civil Action No. 87–C–6123 (N.D.Ill. Nov. 2, 1987) (Zagel, J.); *Motor Carrier Audit and Collection Co. v. Casion.* Civil Action No. 87 C 6124 (N.D.Ill. Oct. 27, 1987) (Aspen, J.).

**14.** In footnote 13 of their memorandum, respondents invoke *INF, Ltd. v. Spectro Alloys Corp.,* 651 F.Supp. 1405 (D.Minn.1987), for the proposition that "[p]roper concern for 'promoting proper relationships between the courts and administrative agencies leads to the conclusion that this litigation should be stayed so that the ICC may determine whether [plaintiff's] action is unreasonable." *Id.* at 1407. Subsequently, however, in *INF, Ltd. v. Spectro Alloys Corp.,* 690 F.Supp. 808, 810 (D.Minn.1988), the court rejected the Commission's split decision in favor of the filed rate doctrine.

## 2. *Motor Carrier Act of 1980*

■ We also take issue with the Commission's use of the Motor Carrier Act of 1980 ("MCA") to justify MC–177. The Commission therein held that

[t]he MCA dramatically altered the competitive atmosphere of the motor carrier industry. The relaxation of regulatory requirements and Commission oversight has resulted in intense, new competition. Thousands of carriers have entered the market with broad operating authority and increased pricing freedom. The new business atmosphere requires these carriers to price competitively and on extremely short notice if they are to retain existing traffic or quickly obtain new (including backhaul) traffic.

*MC–177,* 3 I.C.C.2d at 105. The MCA is not, however, sufficient legal justification for reinterpreting the ICC's unreasonable practice jurisdiction in a way which undercuts the antidiscrimination purpose of the Act.

In *Square D Co. v. Niagara Frontier Tariff Bureau,* 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986), the Supreme Court reviewed the effect of the Motor Carrier Act of 1980 on the filed rate doctrine. The Court held that the holding of *Keogh v. Chicago & Northwestern R. Co.,* 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922), that a private shipper could not recover treble damages under § 7 of the Sherman Act in connection with ICC-filed tariffs, survived both the Reed–Bulwinkle Act and the Motor Carrier Act. *Id.* 476 U.S. at 419–20, 106 S.Ct. at 1927–29. The *Square D* Court recognized that *Keogh* might be inconsistent with the 1980 Act and that overruling it would in fact promote the pro-competitive goals of the Act. Nonetheless, the Court concluded it was powerless to act:

We may assume ... that the *Keogh* decision was unwise as a matter of policy— but it nevertheless remains true that Congress must be presumed to have been fully cognizant of this interpretation of the statutory scheme, which had been a significant part of our settled law for over half a century, and that Congress did not see fit to change it when Congress carefully reexamined this area

of the law in 1960. Petitioners have pointed to no specific statutory provision or legislative history indicating a specific congressional intention to overturn the longstanding *Keogh* construction; harmony with the general legislative purpose is inadequate for that formidable task.

476 U.S. at 420, 106 S.Ct. at 1928 (footnote omitted). We think this conclusion is equally applicable to MC–177's treatment of the 1980 Act; mere consistency with its purpose is insufficient justification for altering settled law.

It is notable that Congress did visit the question of tariff reasonableness in the 1980 Act. The Act restricted the ability of the Commission to declare certain rates unreasonable by creating a "zone of rate freedom" for rates which fall within a specified percentage range of statutory points of reference. *See* 49 U.S.C. §§ 10708(d)(1)(B), (d)(4)(B). The Act also created a presumption that rate bureau agreements meeting Commission guidelines are entitled to antitrust immunity. *See* 49 U.S.C. § 10706(b)(2). "However, despite extensive provisions in the Act dealing with motor carrier rates, nowhere did Congress provide the faintest inkling that it viewed the filed rate doctrine as a regulatory anomaly which hampered competition." *In re Total Transportation, Inc.,* 84 B.R. at 597. To the contrary, the legislative history strongly supports the proposition that antidiscrimination goals survived the Motor Carrier Act:

The thrust of [the new zone of rate freedom subsection] is to provide for more pricing freedom and less government regulation and to balance freer entry into the industry, freer expansion of the industry, and the additional competition that will result from other provisions of the bill. The concept, then, is to spur competition both in service and in pricing....

This new latitude carries with it less government involvement, except in the area of discriminatory and predatory pricing. In these two areas, the Commission's powers remain intact.

H.Rep. 96–1069, 96th Cong. 2d Sess. 25, *reprinted in* 1980 U.S.Code Cong. & Ad-

min. News 2283, 2307. We do not question that the Commission can "adapt [its] rules and practices to the nation's needs in a volatile changing economy." 3 I.C.C.2d at 103 n. 10. But in light of our finding that MC–177 in these circumstances will foster discrimination, we think that the 1980 Act's legislative history fails to support the Commission's position. As noted in *G.M.W., Inc. v. Certified Parts Corporation,* 135 Wis.2d 503, 400 N.W.2d 512 (App.1986):

> The concurrence would adopt a broad rule permitting courts, in concert with the ICC, to circumvent an Act of Congress. Courts are not free to do this. The ICC as it recognizes, is also not free to do this. *Wilson* addresses the significant reasons why Congress adopted the "filed tariff" doctrine, and holds that under the unique facts of that case, the ICC could find part of a tariff unreasonable, and therefore enforceable. It is another matter altogether to suggest that any tariff can be an "unreasonable practice". Such a suggestion raises questions of separation of powers, an issue not raised or argued here.

*Id.* 400 N.W.2d at 515.

There is ample authority to suggest that, notwithstanding the ICC's advisory opinion, this court can refuse to permit the defendants to enforce the negotiated but unfiled rate. *See, e.g., In re Robinson Truck Lines,* 89 B.R. 584, 592 (Bankr.N. D.Miss.1988) ("Based on a thoughtful review of the decisions rendered by the ICC in the three proceedings referred to it by this Court, this Court is of the opinion that it cannot confirm or adopt any of the decisions"); *INF, Ltd. v. Spectro Alloys Corp.,* 690 F.Supp. 808, 810 (D.Minn.1988) ("Referral to the ICC under these circumstances allowed the record to be developed fully by permitting the ICC to express its view on the issues in question. Nevertheless, after giving thorough consideration to the Commission's decision, the court determines that it remains bound by the 'filed rate' doctrine established by Congress and the Supreme Court"); *Motor Carrier Audit & Collection Co. v. United Food Service, Inc.,* at 4 ("While the ICC may so advise a court, it is difficult to understand how, in the light of clear precedent establishing that equitable defenses are not generally available, a court could adopt the ICC's recommendation that a defendant be allowed to assert those defenses").

## CONCLUSION

The Commission itself admits that "the referring court retains the authority to set the remedy, if any, and review our determination." *MC–177,* 3 I.C.C.2d at 107. We agree with the Commission that enforcing the notation requirement, given the circumstances, would be unreasonable. We disagree, however, with its conclusion that the suit for undercharges is unreasonable because of a previously negotiated but unfiled rate.

For the foregoing reasons, we grant plaintiffs' motion for summary judgment as applied to their $43,267.67 undercharge claim for the billing of negotiated but unfiled rates. We therefore deny defendant's and respondents' motions for the same. We also deny plaintiffs' motion for summary judgment, as applied to their $67,403.48 undercharge claim for the absence of the appropriate notation. We grant defendant's and respondents' motions for summary judgment on those undercharges. We also award the plaintiffs prejudgment interest on their $43,267.67 undercharge claim.