**WESTERN TRANSPORTATION COMPANY, Plaintiff-Appellant,**

v.

**WILSON AND COMPANY, INC. and Wilson Foods Corporation, Defendants-Appellees.**

No. 82–1053.

United States Court of Appeals, Seventh Circuit.

Argued June 4, 1982.

Decided July 12, 1982.

Rehearing Denied Sept. 22, 1982.

Steven C. Weiss, Chicago, Ill., for plaintiff-appellant.

David L. Schiavone, Chicago, Ill., for defendants-appellees.

* Of the Northern District of Illinois.

Before POSNER and COFFEY, Circuit Judges, and CAMPBELL,* Senior District Judge.

POSNER, Circuit Judge.

■ A common carrier regulated by the Interstate Commerce Commission may not receive a different compensation for its services from the rate specified in the applicable tariff, 49 U.S.C. § 10761(a), and if by mistake it charges a lower rate it may sue under 28 U.S.C. § 1337 to recover the undercharge. E.g., *Madler v. Artoe*, 494 F.2d 323 (7th Cir. 1974). The carrier's right to recover is quite unaffected by the usual limitations on contract actions based on mistake. "The shipment being an interstate one, the freight rate was that stated in the tariff filed with the Interstate Commerce Commission. The amount of the freight charges legally payable was determined by applying this tariff rate ... [and] thus, they were fixed by law. No contract of the carrier could reduce the amount legally payable; or release from liability a shipper who had assumed an obligation to pay the charges. Nor could any act or omission of the carrier (except the running of the statute of limitations) estop or preclude it from enforcing payment of the full amount by a person liable therefor." *Louisville & Nashville R.R. v. Central Iron & Coal Co.*, 265 U.S. 59, 65, 44 S.Ct. 441, 442, 63 L.Ed. 900 (1924); see also *Fry Trucking Co. v. Shenandoah Quarry, Inc.*, 628 F.2d 1360, 1361 (D.C.Cir.1980).

This is a harsh rule. Courts strain against it. A favorite device is to find that a tariff is ambiguous and then interpret it to reach a result that the court considers just. That is what the district court did in this case. The plaintiff, Western Transportation Company, is a motor common carrier regulated by the ICC. It went bankrupt, and in connection with its bankruptcy hired a consulting firm to comb through its invoices looking for undercharges—with results that are showing up with increasing

frequency in the Federal Reporter. See, e.g., *Western Transp. Co. v. Webster City Iron & Metal Co.*, 657 F.2d 116 (7th Cir. 1981). The defendants in this case, affiliated corporations that we shall refer to as Wilson, had between 1976 and 1978 shipped meats on Western under a tariff applicable "only when the shipment is loaded into or onto the truck by the shipper and unloaded therefrom by the consignee." There is no dispute that Wilson and its consignees complied fully with this requirement, but the tariff also provides that "the Bill of Lading and Shipping Order covering the shipment must contain a notation that consignor is to load and/or consignee is to unload the shipment, as the case may be," and on a number of shipments the required notation was missing. Western is seeking in this action the difference between what it charged under this tariff and what it would have charged under the different tariff that would have been applicable if this one was not: about $124,000.

The district court held that the tariff was ambiguous because it allows the carrier to charge a higher rate if the shipper and consignee do not load and unload, even if the bill of lading notes that they intend to do so, but affords no "reciprocal opportunity for Wilson to look beyond the notation requirement" and pay the lower rate if it loads (and its consignee unloads) but fails to include the required notation in the bill of lading. Interpreting the tariff, the court concluded that the draftsmen would probably have wanted Wilson to get the lower rate, and dismissed the complaint. (There is a subordinate issue, relating to certain storage and pick-up charges, which we discuss at the end of this opinion and which the court below also resolved, though on other grounds, against Western.) Western has appealed.

■ We disagree with the district court. We find no ambiguity in the tariff, any more than we did in *Western Transp. Co. v. Webster City Iron & Metal Co.*, *supra*, which involved the same carrier and very similar facts. The tariff imposes two requirements: the shipper and consignor must load and unload, and the bill of lading must contain a notation to that effect. That the notation requirement is pointless and a trap for the unwary, we grant; that allowing Western to collect for its "undercharge" will enrich it unjustly, by "compensating" it for services—loading and unloading the meats shipped by Wilson—that it did not perform, we also grant; that Western should as a matter of justice be estopped to claim a higher rate, since it was perfectly willing to allow Wilson to pay a lower rate without putting a notation to that effect on the bill of lading, we grant too. But these considerations do not make an unambiguous tariff ambiguous. If the duty to load and unload and the duty to say you will load and unload were contradictory, the tariff—construed, as every document must be construed, as a whole—would be ambiguous. They are not, and it is not.

■ If we were dealing with an ordinary contract we would have not the slightest hesitation in concluding that at the time the shipments were made the parties did not intend the noting of the shipper's intent to load (and the consignee's to unload) to be a condition precedent to the shipper's receiving the rate specified in the contract of carriage, provided the shipper and consignor actually did the loading and unloading, as they did here; and we would construe the contract accordingly. But the system of regulation created by Congress when it passed the first Interstate Commerce Act in 1887, a system unchanged (so far as is relevant to this case) to this day, limits the freedom of contract between shippers and carriers. Among other things that Congress was concerned with—at least ostensibly, and ostensible concerns are pretty much all a court can consider when construing a statute—was the "evil" of big shippers' getting secret discounts from railroads. See S.Rep.No.46, 49th Cong., 1st Sess. 181, 188–90, 198–200 (1886); *New Haven R.R. v. ICC*, 200 U.S. 361, 391–92, 394, 26 S.Ct. 272, 276–77, 278, 50 L.Ed. 515 (1906). To prevent this supposed evil Congress required the railroads (and later the motor carriers, when they were brought

under the Interstate Commerce Commission's wing too) to charge only in accordance with published tariffs. See Act of Feb. 4, 1887, ch. 104, § 6(7), 24 Stat. 380, as amended, 49 U.S.C. §§ 10761, 10762. This goal would be subverted if a shipper and carrier could by agreement change the terms of the applicable published tariff. See S.Rep.No.46, *supra*, at 200. In effect Wilson received an off-tariff discount, because it was allowed to pay a low rate without complying with all of the terms of the tariff containing the rate.

■ Of course the facts of this case are remote from the concerns that moved Congress to set up the scheme we have described. There is no indication that Wilson is a powerful shipper or that not complying with the notation requirement saved it significant expense and so was the equivalent of a secret discount and hence a source of actual or potential advantage over competing shippers. But Congress did not create a flexible standard for the courts to apply in accordance with the facts, equities, and economic realities of the particular case. It forbade carriers to receive any different compensation from the rate in the applicable tariff. The tariff under which Wilson shipped its meats via Western was not the applicable tariff, because Wilson failed to comply with all of its terms; and Western is therefore entitled to recover the undercharge, regardless of equitable considerations. There is no judicial power of equitable reformation of tariffs as of ordinary contracts. We will not allow the loose use of the word "ambiguity" to bring in such reformation by the back door.

■ True, it is often said that "a tariff should be interpreted to avoid unjust, absurd, or improbable results" and that "the practical application of tariffs by interested persons should also be considered in determining the meaning of the tariffs." *National Van Lines, Inc. v. United States*, 355 F.2d 326, 332–33 (7th Cir. 1966). If applied to this tariff, such precepts would be fatal to Western. But they are general precepts of contract construction and do not apply to a tariff unless it is ambiguous. If it is ambiguous, it should be construed like any other contract. But if it is unambiguous the parties are bound by its terms and the aids to construction are irrelevant. We realize how artificial this approach would be if tariffs were merely contracts. If the parties to a contract mean something different from what they said, it is their intentions (so long as they coincide), not the imperfect expression of those intentions in the words of the contract, that govern. But that is because the purpose of contract interpretation is to carry out the will of the parties as of the time the contract was made. An equally important purpose of tariff interpretation is to prevent special deals. That is why interpretation is permitted only when the tariff is ambiguous, so that a literal reading is impossible.

■ But it does not follow that the shipper is necessarily without any remedy in a case like this. A tariff provision has to be reasonable. See 49 U.S.C. § 10704(a). If it is not, it violates the statute; and the Commission, either on its own initiative or on complaint, "shall take appropriate action to compel compliance with" the statute. 49 U.S.C. § 11701. If the notation requirement is, as it appears to be, entirely pointless, the Commission can be expected to set aside this part of the tariff—thus knocking the props out from under Western's case— if asked to do so. Wilson should have done what Iowa Beef Processors, Inc., another of Western's customers, did when sued by Western in bankruptcy court on the very tariff in issue in this case—ask for a stay of the court proceedings and then ask the Commission to declare the notation requirement unreasonable. The Commission did so. *Iowa Beef Processors, Inc. v. Western Transp. Co.*, ICC Docket No. 32521F (Sept. 14, 1981). Incidentally, the Commission also found the tariff to be unambiguous— that is why it had to reach the issue of reasonableness—and this finding should have carried great weight with the district court in the present case.

■ Although it seems highly likely that the Commission would, if asked, hold that the notation requirement was unrea-

sonable as applied to Wilson—since, as we have said, it is the same requirement, in the same tariff, that Iowa Beef successfully challenged—the district court did not have the power to declare the requirement unreasonable. Only the ICC can do that, see, e.g., *Texas & P.R. Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 448, 27 S.Ct. 350, 358, 51 L.Ed. 553 (1907); *ICC v. Atlantic Coast Line R.R.*, 383 U.S. 576, 579–80, 86 S.Ct. 1000, 1003–04, 16 L.Ed.2d 109 (1966); and Wilson, for reasons unexplained, failed to ask the court for a stay to permit a reference to the ICC. But it is not too late for Wilson. Ordinarily we would not condone a shipper's litigating his defenses to an undercharge action in stages—first arguing that the tariff is ambiguous, then after losing on that ground in the court of appeals asking the Commission to declare the tariff unreasonable. But since the Commission has held, in the *Iowa Beef Processors* case, that the tariff provision in question is unreasonable, and since the carrier's case rests on the most diaphanous of technicalities, we shall give the shipper another chance.

We note parenthetically that Wilson should not encounter any statute of limitations problem despite the long lapse of time between the alleged undercharges and any complaint or petition that it may file with the Commission in the wake of this decision. The statute of limitations in the Interstate Commerce Act, 49 U.S.C. § 11706, refers only to actions seeking payment of money, which Wilson's action in the Commission would not, technically anyway, be. In any event, *United States v. Western Pac. R.R.*, 352 U.S. 59, 71, 77 S.Ct. 161, 169, 1 L.Ed.2d 26 (1956), holds that the statute of limitations does not "bar reference to the Commission of questions raised by way of defense in suits which are themselves timely brought." Were this not the rule, a plaintiff such as Western could bar the shipper's recourse to the Commission simply by delaying its suit until the limitations period had almost run.

It remains to consider the plaintiff's claim for some $12,000 in miscellane-

ous storage and Sunday pick-up charges (mainly the former). The tariff provides that the shipper must pay the cost of storing his goods if it was his own act or omission that forced the carrier to store them. Wilson moved for summary judgment and submitted in support of the motion an affidavit denying that it had requested any services on the dates in question. Western submitted a contrary affidavit by its consultant. The district court granted Wilson's motion on the ground that the consultant's affidavit contained merely his "own opinions and conclusions based on his personal work sheets." We are puzzled by this statement. Attached to the affidavit were two invoices which appear to support Western's claim for storage charges, and we do not understand how the court could have concluded that Western had failed to raise a genuine issue of material fact, see Fed.R.Civ.P. 56(c), at least with respect to those invoices. Moreover, the affidavit states that these invoices are representative of others, and Western was entitled to an opportunity to substantiate this statement. We are not enlightened by the district court's citation of *Durasteel Co. v. Great Lakes Steel Corp.*, 205 F.2d 438, 441 (8th Cir. 1953), for the proposition that Western failed to raise a genuine issue of material fact; all *Durasteel* holds (so far as is relevant to this case) is that "an issue of fact is not genuine unless it has legal probative force as to a controlling issue." The issue of whether Wilson caused Western to store Wilson's freight was certainly genuine in this sense. We are not prepared to conclude that this part of the case cannot be disposed of on summary judgment but we want the district court to take another look at its ruling in light of the above discussion.

The judgment of the district court is reversed and the case remanded for further proceedings consistent with this opinion. As we have said, Wilson may if it wants request the district court to stay the proceedings while it raises before the Interstate Commerce Commission, under the procedure set forth in 49 C.F.R. § 1100.26, the issue of the reasonableness of the notation

requirement in the tariff. See *Union Pac. R.R. v. Bay Area Shippers Consolidating Ass'n, Inc.*, 594 F.2d 1291, 1294 (9th Cir. 1979).

REVERSED AND REMANDED.