**CARRIERS TRAFFIC SERVICE, INC., Plaintiff/Petitioner,**

v.

**TOASTMASTER, INC., Defendant,**

and

**United States of America and Interstate Commerce Commission, Respondents.**

Nos. 84 C 7338, 88 C 5167.

United States District Court, N.D. Illinois, E.D.

Dec. 29, 1988.

Steven C. Weiss, Steven C. Weiss & Associates, Chicago, Ill., for plaintiff/petitioner.

Peter M. Shannon, Jr., Robert E. Arroyo, Keck, Mahin & Cate, Chicago, Ill., for defendant.

Anton R. Valukas, Ann Wallace, U.S. Attys., Chicago, Ill., Robert S. Burke, Ellen

D. Hanson, Judith A. Albert, I.C.C., Washington, D.C., for respondents.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Carriers Traffic Service, Inc. ("CTS") has petitioned this court to set aside the March 14, 1988 decision of the Interstate Commerce Commission ("ICC") in *Toastmaster, Inc. v. Orscheln Bros. Truck Lines, Inc.*, No. MC–C–10988 (the "Opinion"). Toastmaster, Inc. ("Toastmaster") and ICC and the United States (collectively "ICC" for convenience) seek affirmance of the Opinion. All the parties have filed motions for summary judgment. For the reasons stated in this memorandum opinion and order, ICC's decision is upheld—though not always for the reasons it has stated.

### Parties and Procedural History

In 1984 Barry Schermer as Trustee for Orscheln Bros. Truck Lines, Inc. ("Orscheln") sued Toastmaster in this District Court[1] pursuant to the Interstate Commerce Act ("Act"), 49 U.S.C. § 10761,[2] seeking to collect alleged freight undercharges for interstate transportation service provided to Toastmaster between 1981 and Orscheln's 1983 filing in bankruptcy. Those claimed undercharges stemmed from the differences between (1) published tariff rates on the basis of which Toastmaster was actually billed and (2) the published rates Orscheln assertedly should have used in its billing.

On November 8, 1985 Judge Leighton issued an order staying proceedings in this District Court and directing Toastmaster to file a petition with ICC to determine whether the collection of such undercharges would be "unreasonable" in this case.[3] Toastmaster did so on January 23, 1986.[4] After conducting evidentiary proceedings ICC issued its Opinion, ruling partially in favor of Toastmaster and partially in favor of CTS.

When CTS returned to this District Court seeking to set aside and annul ICC's decision, this Court expressed concern as to whether its jurisdiction under 28 U.S.C. § 1336(b) called for the institution of a new action rather than merely a filing under the old 1984 case number (see this Court's brief May 19, 1988 memorandum order). To avoid any possible procedural risks in that respect, CTS brought such a new action (88 C 5167), adding as parties defendant ICC and the United States (they had also been named as respondents in CTS' post-Opinion petition in the 1984 lawsuit). Then the two cases were consolidated, and they have proceeded in tandem to this stage.

### ICC's Decision [5]

ICC was called on to deal with the "reasonableness" of Orscheln's claimed undercharges on 458 shipments[6] for Toastmaster's account, made from various locations to its Missouri manufacturing facilities at

---

1. Initially the case (84 C 7338) was assigned to the calendar of this Court's now-retired colleague, Honorable George N. Leighton.

2. Further citations to the Act will take the form "Section—," referring to the Title 49 numbers rather than to the Act's internal numbering.

3. Section 10701(a) states:
   A rate (other than a rail rate), classification, rule or practice related to transportation or service provided by a carrier subject to the jurisdiction of [ICC] under chapter 105 of this title must be reasonable.

4. In the meantime, in December 1985 CTS purchased all of Orscheln's rights, title and interest in its freight bills and accounts. That made CTS the real party in interest in the claim against Toastmaster.

5. With cross motions for summary judgment, this Court is in the Janus-like position of having to draw all reasonable inferences in favor of the nonmovant on each motion (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir.1987)). That poses no problem here, where the material facts are not really in dispute. All references to the parties' statements of material facts not in dispute pursuant to this District Court's Rule 12(*l*) and 12(m) will take the form "[Name of party] Facts ¶ —."

6. That number is approximate, as ICC concedes (Opinion at 1). Thus, for example, CTS Mem. 2 refers to "approximately 455 shipments." This opinion accepts the ICC number as correct.

Boonville, Clarence, Columbia, Macon and Moberly. ICC classified the shipments into five groups and discussed the rate applicability and resultant findings as to each group.

*Group 1*

Group 1 comprised 325 truckload and less-than-truckload ("LTL") shipments of freight-all-kinds ("FAK") between March 19, 1981 and August 15, 1983. Charges were assessed according to rates described in Tariff ICC OBTL 600 ("OBTL 600") or ICC OBTL 600–A ("OBTL 600–A").

OBTL 600, effective June 13, 1982, applied only to "consolidated" shipments. OBTL 600–A, which cancelled and superseded OBTL 600 effective July 2, 1983, contained the same limiting language. However, it also contained a new "Item 200," listing a rate conditioned on the trailer being loaded to capacity and "shipper load/consignee unload."

Effective October 28, 1982, Supplement 1 to OBTL 600–A cancelled Item 200 and replaced it with Item 200–A. All that new item did was to repeat the former provisions of Item 200 and add the phrase "Item subject to a $50.00 stop charge." However, neither OBTL 600 nor OBTL 600–A actually authorized stop-off service.

Effective February 5, 1983, Supplement 2 to OBTL 600–A cancelled Supplement 1 (making no separate reference to Supplement 1's Item 200–A). Supplement 2 did include its own Item 200–A that simply "cancelled" Item 200 (an obvious anomaly, given the fact that Item 200 had already been cancelled by Supplement 1).

All 325 shipments in Group 1 were single, non-consolidated shipments. Opinion at 4 therefore found OBTL 600 did not apply to them. That left the more complex issue of whether Item 200 in the original OBTL 600–A (before its two supplements were promulgated) applied to such shipments.

On that score, Opinion at 4 found Item 200—which by its terms covered only shipments where the shipper loaded *and* the trailer was loaded to capacity—did refer to single shipments. Because OBTL 600–A specified it was limited to consolidated shipments, ICC found a resultant ambiguity, which it resolved in favor of Toastmaster. Thus ICC found the rate in Item 200 *was* applicable to single shipments.

ICC also found that although the exact effect of Supplements 1 and 2 was unclear, the Item 200 rate applying to single shipments was effectively cancelled on February 5, 1983. Nonetheless, exercising its "reasonable practice" jurisdiction, ICC concluded that the parties did not intend that the tariff would no longer be applicable to single shipments. Instead Opinion at 5 found another provision of the OBTL 600 series, Item 120, was intended to cover single shipments even though its language indicated otherwise. Indeed, Orscheln's representative who drafted Supplement 2 specifically explained "he did not intend to remove the single shipment provision" that Item 200 had embodied (Opinion at 5).

In summary, ICC concluded it would be unreasonable for CTS to collect (1) anything in excess of the Item 200 rate when it was in effect (until February 5, 1983) and (2) anything in excess of the Item 120 rates thereafter. Toastmaster thus effectively won as to Group 1, the bulk of the shipments in dispute.

*Group 2*

Group 2 comprised 11 LTL shipments of FAK. Those shipments were consolidated by another carrier, and Orscheln then transported them to Missouri. CTS claims those charges were assessed under Item 19250–A of ICC MWB 201–D ("MWB 201"), applicable only to (1) "mixed shipments" (2) loaded by the shipper and unloaded by the consignee (Opinion at 6). That shipper-load/consignee-unload condition was subject to Item 578 of Rules Tariff ICC MWB 125 ("MWB 125"), which required bills of lading to be endorsed by the shipper at the time of tender to show fulfillment of the condition (*id.*).

ICC found as to those shipments:

1. All shipments were in fact mixed.

2. Bills of lading were not endorsed as required.

3. It was unclear as to who actually loaded and unloaded the shipments.

However, ICC also found the shipments were in fact billed under various rates (*id.*) and the appropriate rates were not determinable (*id.* at 7).

*Group 3*

Group 3 consisted of 17 LTL shipments of aluminized steel sheets or coils, with charges assessed according to the "class 50 LTL rating" in National Motor Freight Classification ("NMFC") Item 106140. That Item applies to articles under the generic heading "IRON OR STEEL," further described as (Opinion at 7):

Plate or Sheet, NOI,[7] . . . galvanized, lacquered, leaded, painted, primed, tarred or plain, corrugated or not corrugated.

However, Item 106720—also under the heading "IRON OR STEEL"—read:

Sheet, aluminum coated, . . . ,

and carried a class 65 LTL rating. CTS argued the shipments should have been charged at the latter rate.

Opinion at 8 found Item 106720, being more specific, applied to Group 3. However, it did allow that if Toastmaster could show that the aluminized sheets were not in fact "aluminum coated" steel sheets, Item 106140 would control.

*Group 4*

Group 4 comprised 80 LTL shipments of aluminum castings sent between July 22, 1981 and June 22, 1983. Until August 13, 1982 (when MWB 201 came into effect) charges were assessed under NMFC Item 13320. Later charges were assessed under Item 4470 of MWB 201.

NMFC Item 13320 applied to "aluminum, castings NOI" subject to Item 13452, requiring the castings to be in one piece and to need further work (Opinion at 8). Opinion at 8 found Toastmaster had established its castings were in one piece and required further work "including deburring and blasting with steel shot." That meant the charged rates under the NMFC were correct.

Item 4470 applies to "ALUMINUM CASTINGS, NOI." Here, however, NOI

meant "Not otherwise more specifically described in the NMFC" (Opinion at 8 n. 12). ICC found the shipments were properly covered by that item after August 13, 1982.

*Group 5*

Group 5 consisted of 25 LTL shipments of enameled steel plate charged under Item 1450 of OBTL 400, applicable to:

IRON OR STEEL GROUP: Terne Plate or Tin Plate, plain or lacquered or painted, NMFC Item 107140.

In fact, that description repeats verbatim the one in NMFC Item 107140. Item 1450 also contained the shipper-load/consignee-unload provision and the same endorsement requirement as in Group 2. CTS contended a rate different from that prescribed in Item 1450 should apply to the Group 5 shipments.

Opinion at 9 & n. 13 found neither Item 1450 nor the CTS-argued-for rate technically applied. But because ICC concluded the Item 1450 rate "was established by [Orscheln] specifically for Toastmaster's traffic" (Opinion at 9 and 11), Opinion at 10–11 held it would be "unreasonable" for CTS now to apply a different rate.

As for the load/unload endorsement, ICC found (*id.*) that if in fact shipper-loading/consignee-unloading had been performed, it would be unreasonable to charge a higher rate merely because of the absence of a notation. ICC left the burden on Toastmaster to show that was the case.

*Standard of Review*

■ Judge Leighton properly stayed this action to allow Toastmaster to determine the reasonableness of CTS' seeking undercharges (see *Western Transportation Co. v. Wilson & Co.*, 682 F.2d 1227, 1231 (7th Cir.1982)). At this stage, with ICC having acted, the Administrative Procedure Act (the "APA," 5 U.S.C. § 706) defines the standard of review: ICC's decision may be set aside only if it is arbitrary and capricious or unsupported by substantial evi-

---

**7.** "NOI" is defined in the NMFC as "Not more specifically described herein" (Opinion at 7 n. 11).

dence (*Illinois v. United States*, 666 F.2d 1066, 1071 (7th Cir.1981)).

■ Of course questions of law—unlike questions of fact or mixed questions of fact and law—are freely reviewable, and this Court is not obliged to defer to ICC's legal conclusions (*Coca–Cola Co. v. Atchison, Topeka & Santa Fe Railway Co.*, 608 F.2d 213, 218 (5th Cir.1979)). CTS Mem. 45 then quotes *Great Northern Railway Co. v. Merchants Elevator Co.*, 259 U.S. 285, 290, 42 S.Ct. 477, 479, 66 L.Ed. 943 (1922) for the proposition that "[e]very question of the construction of a tariff is deemed a question of law." From that CTS concludes any ICC decision involving tariff construction is reviewable de novo by this Court.

That syllogism is attractive in its simplicity but fatally flawed in its reach. Because many instances of tariff construction must go to ICC first under its "exclusive primary jurisdiction" (*United States v. Western Pacific Railroad Co.*, 352 U.S. 59, 63, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956)), CTS' position would lead to the absurd result that certain questions of tariff construction must go to ICC first, only to have its decision be of no moment whatever for the reviewing court.

That cannot be so—and it is not. *Western Pacific*, 352 U.S. at 65–66, 77 S.Ct. at 166 resolved that potential anomaly:

> [W]here the question is simply one of construction the courts may pass on it as an issue "solely of law." But where words in a tariff are used in a peculiar or technical sense, and where extrinsic evidence is necessary to determine their

meaning or proper application, so that "the enquiry is essentially one of fact and discretion in technical matters," then the issue of tariff application must first go to [ICC].

Here ICC held extensive evidentiary proceedings to determine the construction and reasonableness of many tariff provisions. Its conclusions are therefore not reviewable de novo in this Court, but are instead subject to the APA's strictures.

*Application of the Standard of Review Group 1*

■ As to the Group 1 shipments, ICC determined OBTL 600–A was ambiguous because its Item 15 said it applied only to consolidated shipments, yet its Item 200 was necessarily applicable to single and not consolidated shipments. That latter conclusion followed from the finding that the language "trailer loaded to capacity" and "shipper load/consignee unload" in Item 200 were inconsistent with consolidated shipments.

CTS Mem. 13–17 urges (1) ICC created the ambiguity itself (an untenable position given the fact that Orscheln drafted the tariff[8]) and (2) Item 200 is in fact *consistent* with consolidated shipments.[9] That kind of inquiry as to the applicability of technical language used in the trucking industry (whether or not viewed as terms of art) is one best left to experts. Great deference must be given to ICC's conclusion as to the applicability of Item 200 to consolidated and single shipments. This Court therefore accepts ICC's finding of an inconsistency between OBTL 600 as a whole and Item 200.[10]

---

**8.** Opinion at 10 found, amply supported by the record:

> The record indicates that the parties expected [Orscheln] to cancel the Item 200 rate and to extend the application of the Item 120 rates to embrace single movements previously covered by Item 200. This change was not fully reflected in the tariff due to [Orscheln's] tariff publishing inexperience. As noted earlier, the OBTL 600 series was replete with tariff publishing errors and omissions, so CTS cannot seriously argue that the tariff was clear on its face.

**9.** In large part CTS urges such consistency by making arguments and referring to another tar-

iff provision that it concedes "was not discussed before the I.C.C." (CTS Mem. 13). It scarcely needs citation to demonstrate that cannot be the basis for *contesting an agency's decision* when a case has been tendered to it on primary jurisdiction grounds—to obtain *its* expertise—and the litigant has deprived the agency of the opportunity to consider assertedly relevant facts.

**10.** CTS would also have this Court hold an "ambiguity" arises only when one term has more than one meaning and not when two tariff terms conflict. But CTS cites no case for that odd proposition, and this is hardly the first case in which ambiguity has been found in conflict-

Although tariffs should generally be construed "regardless of the intention of the parties and irrespective of the equities existing between carriers and shippers" (*National Van Lines, Inc. v. United States*, 355 F.2d 326, 331 (7th Cir.1966), citing *Louisville & Nashville Railroad Co. v. Maxwell*, 237 U.S. 94, 35 S.Ct. 494, 59 L.Ed. 853 (1915)), when an ambiguous tariff is involved "[t]he intention of the framers and other considerations thus become relevant" (355 F.2d at 332). Ambiguous tariff provisions are normally construed against the carrier as its draftsman—here Orscheln (*C & NW*, 504 F.2d at 908).

Opinion at 4–5 considered the intent of the parties, evidenced in part by correspondence at the time of the tariff. ICC's conclusion was supported by substantial evidence and was neither arbitrary nor capricious. Its decision that Item 200 should apply to single shipments is therefore affirmed.

ICC also found that once the Item 200 rate was effectively cancelled on February 5, 1983, it was the parties' intent that OBTL 600's Item 120 rate would govern. As already stated, Orscheln's draftsman of Supplement 2 confirmed he had intended to keep a single shipment provision in effect, merely increasing the rate on straight shipments (Opinion at 5)—but his inexperience in drafting tariffs had gotten in the way. ICC concluded from all the evidence it would be unreasonable for CTS now to assess a higher rate.

■ Determinations of "unreasonable practice" are within ICC's exclusive primary jurisdiction. (*Western Transportation*, 682 F.2d at 1231–32). As such, those determinations are entitled to great deference. However, this Court may still examine such a decision to ensure that ICC's action is consistent with its mandate (*Seaboard System Railroad, Inc. v. United States*, 794 F.2d 635, 639 (11th Cir.1986)). Thus *Seaboard System, id.* at 638 affirmed ICC's refusal:

to allow the carrier to collect its undercharge when there was no evidence that the carrier intentionally or knowingly undercharged, when waiving the undercharges was unlikely to encourage carriers to indulge in intentional discriminatory rate "misquotations," and when the shipper relied upon the carrier's continuing conduct in misleading the shipper as to the applicable rate under a confusing tariff.

Here ICC found Orscheln charged the rate both parties agreed to, under the auspices of a confusing tariff "replete" with publishing errors (Opinion at 10). Orscheln continued to charge the Item 120 rate up until its bankruptcy. Thus ICC's reasonableness determination is reasonable. It only remains to determine whether that determination squares with the antidiscrimination and uniformity policies of the Act (see *Seaboard System*, 794 F.2d at 638).

■ Enforcing the Item 120 rate would clearly not lead to discriminatory practices. Each of the rates here was negotiated specifically for Toastmaster shipments carried by Orscheln (D.Mem.App. A–1 to A–5). No other shippers used those rates, and the tariffs are now defunct.

That is not necessarily determinative, for ICC's decision—if it were extended to permit equitable defenses generally—would foster the enforcement of rates in conflict with the terms of a tariff, a practice that could lead to discrimination. But that would not be true if ICC's decision is limited to the unusual case where a series of adjustments to an already confusing tariff has led to an agreed-upon rate in conflict with the written word. If so limited, ICC's decision does not engender discrimination. This Court therefore affirms ICC's finding of unreasonableness under the circumstances here.

*Groups 2 and 3*

Neither party has submitted evidence sufficient to determine the applicable rates for those two groups of shipments. ICC's findings are affirmed to the extent they are not disputed by either party. Only one

ing provisions (see, e.g., *Chicago & North Western Railway Co. v. Hunt–Wesson Foods, Inc.* ("C & NW"), 504 F.2d 905, 908 (7th Cir.1974)).

dispute exists: that relating to the Group 2 notation requirement, a question resolved later in this opinion under the heading "Notation Requirement."

*Group 4*

CTS contends ICC improperly found the aluminum castings required "further work" as specified in NMFC Note 13452, which excludes from the definition of that term:

[b]uffing, polishing, plating, painting, similar surface finishing operations or heat treating.

Opinion at 8 found Toastmaster's castings "were in one piece and required further work, including deburring and blasting with steel shot." ICC R.Mem. 5 cites the common dictionary definition to confirm that such deburring is "further work" within the meaning of the Note 13452 provisions that castings "may have fins, sinkerheads, gates or other rough edges removed."

That contention conforms to common usage and contrasts effectively with such "surface finishing operations" as "polishing" or "buffing" (the excluded category under Note 13452). But this Court's independent agreement with ICC's reading is less significant for legal purposes than the fact that, as the parties have framed the issue, the dispute involves application of a tariff provision to particular facts. That is an area in which ICC's decision is given great weight, and no legal argument has been presented requiring reversal.

Because Item 13120 was properly applied to the Group 4 shipments, Item 4470 is a fortiori applicable to Group 4 shipments moving after August 13, 1982. ICC's decision as to those shipments is affirmed.

*Group 5*

Opinion at 9–10 found that although Item 1450 did not technically apply to Group 5 shipments, it would be an unreasonable practice for CTS to collect undercharges because (1) the tariff provision was established for Toastmaster's traffic, (2) both Toastmaster and Orscheln "consistently operated on the assumption that this rate applied" and (3) the rate contended for by CTS did not apply to Group 5 either. ICC's factual findings made in the course of that analysis are deferred to, and its decision is reviewed to ensure that it is consistent with law.

■ In this instance CTS invokes the "filed rate doctrine" (Section 10761(a)):

[A] carrier providing transportation or service subject to the jurisdiction of [ICC] shall provide that transportation or service only if the rate for the transportation or service is contained in a tariff that is in effect under this subchapter. That carrier may not charge or receive a different compensation for that transportation or service than the rate specified in the tariff. . . .

In substantial part the Opinion's just-described approach applies a kind of equitable gloss on (or exception to) that principle by using "unreasonableness" as a defense to an undercharge claim. Judicial treatment of that proposition has been mixed, and neither our Court of Appeals nor the Supreme Court has offered guidance (see the thoughtful and extended analysis by this Court's colleague Honorable James Moran in *Orscheln Bros. Truck Lines, Inc. v. Zenith Electric Corp.*, 708 F.Supp. 845, 847–63 (N.D.Ill.1988)).

But this Court is not called upon to resolve that issue. After all, CTS is a party seeking relief—money—because of claimed undercharges. Like any other plaintiff, it has the burden of proof as to every element of its cause of action. It has had the opportunity to prove an undercharge on remand to ICC for that specific purpose, and it has failed to do so (as already stated, ICC has found—and this Court credits the finding—that neither the filed rate Orscheln actually charged nor the filed rate for which CTS contended applied to the Group 5 shipments).[11] CTS can draw no comfort from the "filed rate doctrine," for it has not proved an integral part of its claim for relief: what the applicable filed rate is.

---

11. To be sure, Opinion at 9 n. 13 suggested the possible applicability of a different filed rate. But CTS did nothing at all to follow up on that suggestion or to suggest any other rate before

ICC, instead returning the case here to attack what ICC has done. Having chosen its course of action, CTS must live with the record it has made (or failed to make).

On this summary judgment motion *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986) prescribes the result:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

In those terms Toastmaster is entitled to a judgment as a matter of law on the Group 5 shipments because of CTS' failure of proof. Thus ICC's decision as to that group is affirmed, although not for the reasons stated in the Opinion.

*Notation Requirement*

■ Opinion at 10–11 determined the notation requirement in Groups 2 and 5 would serve no legitimate purpose if:

1. Shipper-loading/consignee-unloading actually occurred.

2. All parties received the bargained-for benefits.

3. No filed loss or damage claims required shifting the burden of proof.

*Western Transportation,* 682 F.2d at 1231–32 has previously held such pointless notation requirements may properly be set

aside as unreasonable (and see *Orscheln Bros.,* 708 F.Supp. 845, 852–53 for an analysis of *Western Transportation* ).

Hence as long as Toastmaster can show no legitimate purpose was served by the notation requirement, enforcement of the requirement would indeed be unreasonable. It has done just that as to both sets of shipments (Toastmaster R.Mem. 11 & App. B & C as to Group 2; Toastmaster Mem. 8 & App. C as to Group 5). Toastmaster prevails entirely on this issue.

*Conclusion*

ICC's findings as to Groups 1 and 4 are conclusive and are upheld. As for Groups 2 and 3, ICC's findings are also upheld, but more information is needed before undercharges can be assessed. Finally, as to Group 5, ICC's finding is upheld, although not on the grounds in ICC's Opinion.[12]

---

**12.** Toastmaster has also requested dismissal of CTS' motion to set aside ICC's decision, this time on the ground that CTS' Statement of Material Facts violates this District Court's General Rule 12(*l*). Although CTS' Statement is substantially at odds with that rule (it contains, for example, a good many legal arguments and conclusions as well as "material facts"), Toastmas-

ter's request is mooted by this opinion's rejection of CTS' motion on the merits.