899 F.2d 642
 ORSCHELN BROS. TRUCK LINES, INC., Barry S. Schermer, Trustee
and Assignor, and Carriers Traffic Service, Inc.,
Assignee, Plaintiffs-Appellants,
v.
ZENITH ELECTRIC CORP., Defendant-Appellee,
and
United States of America and Interstate Commerce Commission,
Intervening-Defendants-Appellees.
 Nos. 89-1261, 89-1329, 89-1330.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 10, 1990.
Decided April 10, 1990.
Rehearing and Rehearing En Banc Denied May 9, 1990.
 
 Steven D. Armamentos, Ronald M. Hill, Steven C. Weiss, Weiss & Associates, Allan E. Levin, Chicago, Ill., Joseph L. Steinfeld, Jr., Robert B. Walker, Sims, Walker & Steinfeld, Washington, D.C., Samuel M. Lanoff, Mark L. Dressel, Morgan, Lanoff, Denniston & Madigan, Chicago, Ill., for plaintiffs-appellants.
 John J. VanZeyl, Zenith Electronics Corp., Glenview, Ill., Keith G. O'Brien, Wheeler & Wheeler, Washington, D.C., for defendant-appellee.
 Frederick L. Wood, Nicholas J. DiMichael, Richard D. Fortin, Kathleen J. Masterton, Donelan, Cleary, Wood & Maser, Washington, D.C., for amicus curiae National Industrial Transp. League.
 Gail C. Ginsberg, Asst. U.S. Atty., Office of the U.S. Atty., Anton R. Valukas, U.S. Atty., Office of the U.S. Atty., Chicago, Ill., Judith A. Albert, Interstate Commerce Comm'n, Washington, D.C., for intervening-defendants-appellees.
 Before POSNER, RIPPLE, and KANNE, Circuit Judges.
 POSNER, Circuit Judge.
 
 
 1
 A motor carrier's trustee in bankruptcy sued a shipper to recover moneys that the applicable tariffs required the shipper to pay. The shipper argued that the carrier's attempt to collect the money due under the two tariffs in question was, in the circumstances, an unreasonable practice, forbidden by 49 U.S.C. Sec. 10701(a). The doctrine of primary jurisdiction requires that the reasonableness of a carrier's practices be evaluated in the first instance by the Interstate Commerce Commission. United States v. Western Pacific R.R., 352 U.S. 59, 63-70, 77 S.Ct. 161, 164-168, 1 L.Ed.2d 126 (1956); West Coast Truck Lines, Inc. v. Weyerhaeuser Co., 893 F.2d 1016, 1020-22 (9th Cir.1990); Seaboard System R.R. v. United States, 794 F.2d 635, 638 (11th Cir.1986). The district court therefore stayed the case to permit the shipper to make application to the Commission, but in addition referred the matter to the agency explicitly so that any appeal from the Commission's order would go back to the district court rather than come directly to us as it would if there were just a stay and no reference. 28 U.S.C. Sec. 1336(b); Railway Labor Executives' Ass'n v. ICC, 894 F.2d 915 (7th Cir.1990). On reference, the Commission ruled for the shipper. Zenith Electronics Corp.--Applicable Tariffs--Petition for Declaratory Order, No. 40059 (ICC July 29, 1987) (unpublished). The case then returned to the district court, where the carrier asked the district judge to set aside the Commission's ruling and the shipper asked him to uphold it. The judge split the difference. He agreed with the Commission insofar as it held unreasonable the tariff requiring an express notation on the bill of lading that the shipper is doing the loading and unloading in order to entitle the shipper to a lower tariff than if the carrier performs these services. But he disagreed that it was unreasonable for the carrier to collect a rate higher than the rate it had negotiated with the shipper, since the higher rate was the one in the applicable tariff. The shipper, joined by the Commission, appeals from the latter ruling. The carrier filed a cross-appeal, challenging the judge's ruling on the notation requirement, but has abandoned that appeal in light of our decision in Carriers Traffic Service, Inc. v. Anderson, Clayton & Co., 881 F.2d 475 (7th Cir.1989). Carriers Traffic Service upheld the Commission's invalidation of the notation requirement in a suit to which the carrier in this suit was a party along with its trustee in bankruptcy and the assignee of its claims against the shipper.
 
 
 2
 Section 10761(a) of the Transportation Code, a provision that derives ultimately from section 6(7) of the original Interstate Commerce Act of 1887, 24 Stat. 380, provides that a carrier may collect only the rates contained in the tariffs that it has filed with the Commission. The statute does not, however, specify the consequences of a discrepancy between the rate actually charged and the rate in the tariff. No one doubts that if the carrier charges a shipper more than the filed rate, the shipper is entitled to a refund. The trickier case is where the carrier charges the shipper less than the filed rate; shall the carrier always be entitled to recover the difference between what it charged and the filed rate, regardless of the circumstances?
 
 
 3
 The affirmative answer goes by the name "filed-rate doctrine," to which shippers might want to attach the prefix "infamous." Invented (so far as we have been able to determine) by the Interstate Commerce Commission in its regulation of railroads under the original Interstate Commerce Act, Kansas City Southern Ry. v. Carl, 227 U.S. 639, 652-53, 33 S.Ct. 391, 395, 57 L.Ed. 683 (1913); Poor v. Chicago, Burlington & Quincy Ry., 12 I.C.C. 418, 421-25 (1907), the doctrine was approved by the Supreme Court, e.g., Louisville & Nashville R.R. v. Maxwell, 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915); Louisville & Nashville R.R. v. Central Iron & Coal Co., 265 U.S. 59, 65, 44 S.Ct. 441, 442, 68 L.Ed. 900 (1924) (Brandeis, J.), and was extended to motor carriers when they were brought into the Commission's domain by the Motor Carrier Act of 1935. The operation of the doctrine in the motor carrier setting is illustrated by Western Transportation Co. v. Wilson & Co., 682 F.2d 1227 (7th Cir.1982), which involved the same notation-of-loading tariff as is involved in the Carriers Traffic Service case and in the present case.
 
 
 4
 To understand the purpose of the filed-rate doctrine and hence the Commission's recent efforts to relax it, on which see National Industrial Transportation League--Petition to Institute Rulemaking on Negotiated Motor Common Carrier Rates, 3 I.C.C.2d 99 (1986); Buckeye Cellulose Corp. v. Louisville & Nashville R.R., 1 I.C.C.2d 767 (1985), affirmed as Seaboard System R.R. v. United States, supra; Petition to Institute Rulemaking on Negotiated Motor Common Carrier Rates, 5 I.C.C.2d 623 (1989), one must understand the history of federal regulation of common carriers. Railroads have heavy fixed costs, and in their heyday faced little effective competition from other modes of transportation. Naturally they tended to load the fixed costs onto those shippers who had poor competitive alternatives and to charge low prices to those shippers who had good alternatives by reason of (for example) being big enough to induce two or more railroads to serve their plants. This created a disparity in transportation costs painful to shippers who paid high railroad rates and were competing with shippers who paid low rates, and it also undermined the railroads' efforts to cartelize railroad transportation. The confluence of interests between railroads and weak shippers resulted in a regulatory scheme in which railroads were forbidden both to price off tariff and to refuse service to any shipper at the tariffed rate. Western Transportation Co. v. Wilson & Co., supra, 682 F.2d at 1230-31. The scheme would have been undermined if carriers had been permitted to negotiate secret discounts with favored shippers. Regular Common Carrier Conference v. United States, 793 F.2d 376, 379 (D.C.Cir.1986). To deter this was the office of the filed-rate doctrine. It authorized carriers to recover the discounts regardless, which meant that the shipper could not count on being able to keep any discount that the railroad might dangle before it. Motor carriers do not have heavy fixed costs, but they do not like competition any more than railroads do, so when in 1935 they were brought under federal regulation (in major part to protect the railroads from their competition) they were placed under the filed-rate doctrine too.
 
 
 5
 Many years later came deregulation, which has changed the trucking industry beyond recognition. As a result of amendments made to the Motor Carrier Act in 1980 and their interpretation by the Commission, the present regime is essentially one of free competition. No longer does the ICC seek to nurture and protect cartel pricing and division of markets. A motor carrier that wants to lower its price can file a new tariff effective the following day. Short Notice Effectiveness for Independently Filed Motor Carrier & Freight Forwarder Rates, 1 I.C.C.2d 146 (1984), affirmed as Southern Motor Carriers Rate Conference v. United States, 773 F.2d 1561 (11th Cir.1985). No longer does the Commission seek to limit the number of motor carriers, which has more than doubled in less than a decade. Most important, a carrier and shipper who want to get out from under tariff regulation altogether have only to negotiate a contract of carriage, and then the lawful price is the price in the contract rather than in any filed tariff. There used to be all sorts of restrictions on contract carriage, which greatly limited it as an escape hatch from regulation. There are no longer. Wheaton Van Lines, Inc. v. ICC, 731 F.2d 1264 (7th Cir.1984). The skeleton of regulation remains; the flesh has been stripped away.
 
 
 6
 Counsel for the carrier in this case--which is to say for the carrier's trustee in bankruptcy--conceded at argument that the motor carrier industry is today highly competitive. But if so, the filed-rate doctrine has lost its raison d'etre. The classic explanations for the doctrine are from a different world. "If a mistake in naming a rate between two given points is to be accepted as requiring the application of that rate by the carrier, the great principle of equality in rates, to secure which was the very purpose and object of the enactment of these several statutes, might as well be abandoned." Poor v. Chicago, Burlington & Quincy Ry., supra, 12 I.C.C. at 421. "Stability and equality of rates are more important to commercial interests than reduced rates." Id. at 422. "Occasional hardships may result from any inelastic rule of general application. The principle, however, is vital in our commercial life that there shall be one fixed and absolutely rigid rate governing the transportation at a given time of any given commodity between two given points." Id. at 423.
 
 
 7
 Cessante ratione legis, cessat et ipsa lex. Firms in a competitive market cannot discriminate against weak shippers, for even the weak shipper has, by definition of competition, alternative sources of supply to which to turn if one of his suppliers tries to make a monopoly profit off him. "In the more competitive, more flexible pricing atmosphere created by [deregulation], there is little likelihood of carriers using a rate misquotation as a means to discriminate in favor of particular shippers." Petition to Institute Rulemaking on Negotiated Motor Common Carrier Rates, supra, 5 I.C.C.2d at 625. And since it is no longer the policy of Congress or the ICC to foster monopoly pricing in the motor carrier industry, no public object is served by forcing carriers to adhere to published price schedules regardless of circumstances. All this the Commission found and persuasively articulated in National Industrial Transportation League, supra, 3 I.C.C.2d at 104-08.
 
 
 8
 Strict, mechanical adherence to the filed-rate doctrine produces absurd results well illustrated by the present case. The carrier and the shipper negotiated a mutually attractive rate. The carrier told the shipper that the rate was in a tariff that it had just filed. The shipper could have checked, because there are "watching services" to which one can subscribe that check the tariff filings in the Commission every day. But the shipper did not consult a watching service and through some inadvertence the carrier neglected to file the tariff. (Maybe it was because of a pattern of inadvertence that the carrier later went broke.) The shipments were made, and the shipper paid the agreed-on price, which it believed was the tariffed price. Years passed. The carrier went broke. The trustee in bankruptcy--unconcerned about the effects on customer good will of suing for undercharges, because the carrier was being liquidated--combed through the carrier's invoices, looking for deviations from the tariffed rates. This is a pastime of trustees of bankrupt carriers. Id. at 99; Western Transportation Co. v. Wilson & Co., supra, 682 F.2d at 1229-30; Inman Freight Systems, Inc. v. Olin Corp., 807 F.2d 117 (8th Cir.1986). The trustee found that the tariff which the shipper had thought the carrier had filed had not been filed, and he brought this suit.
 
 
 9
 The suit serves no social purpose, yet Congress has not amended section 10761(a), which by stating that carriers shall price only in accordance with their filed tariffs (a "carrier may not charge or receive a different compensation ... than the rate specified in the tariff") enacts, in the view of the carrier, the filed-rate doctrine. The Interstate Commerce Commission has no authority to repeal a section in an Act of Congress, even if Congress itself would surely have done so had it realized how the section interacted with the amendments it was making to the Act. But this is not what the Commission has done. Section 10761(a) does not enact the filed-rate doctrine. It does require pricing in accordance with published tariffs, but it does not prescribe the consequences if the parties deviate from the tariff by mistake. It is the filed-rate doctrine that prescribes them, and the doctrine emanates not from section 10761(a) alone but also from the requirement in sections 10701(a) and 10704(a) that a carrier's practices be reasonable.
 
 
 10
 The Commission has not modified any statute. It has modified a Commission-made doctrine by holding that the carrier who leads the shipper to believe that there was a tariff on file covering the agreed shipment at the agreed price will be estopped to contend otherwise--will in other words be guilty of an unreasonable practice if he tries to enforce a different tariff. The analogy is to a statute like 42 U.S.C. Sec. 1983 that defines an actionable wrong but leaves to the courts the task of filling in the remedial details through doctrines of immunity and the like. Section 10761(a) creates the basic prohibition, but it is left to the Commission, in the exercise of its broad discretionary powers under the reasonable-practice provisions of the Transportation Code, to shape the remedy for violations of the prohibition.
 
 
 11
 It is in failing to consider the interplay between section 10761(a), which requires pricing in accordance with filed tariffs, and sections 10701(a) and 10704(a), which require carriers to adhere to reasonable practices, that the Fifth Circuit went astray (we respectfully suggest) in In re Caravan Refrigerated Cargo, Inc., 864 F.2d 388 (5th Cir.1989), the case that created an intercircuit conflict on the validity of the Commission's new approach to filed-rate questions. The Fifth Circuit treated the filed-rate doctrine as an interpretation of section 10761(a) that the Supreme Court had, by approving, placed beyond power of change by the Commission, by a lower federal court, or perhaps by any body other than Congress. But all that section 10761(a) requires is pricing according to filed tariffs. The proposition that a deviation from such pricing, however innocent, should exact from the shipper the forfeiture of his bargain in any and all circumstances is an interpretation of the concept of a reasonable practice, a concept the provenance of which is section 10701(a) rather than 10761(a).
 
 
 12
 A statute that creates a norm of reasonableness is open-ended; what is unreasonable at time n may become reasonable at time n + 1. As the carrier notes, citing our decision in Western Transportation Co. v. Wilson & Co., supra, the recognition of a defense of estoppel would have been a questionable application of reasonable-practice doctrine in the days before deregulation. The overriding regulatory purpose then was to deter the shipper from accepting an off-tariff price. It was promoted by denying the shipper any defense if the price turned out to be an off-tariff one, because "billing clerks and other agents of carriers might easily become experts in the making of errors and mistakes in the quotation of rates to favored shippers." Poor v. Chicago, Burlington & Quincy Ry., supra, 12 I.C.C. at 421. Now that off-tariff pricing is harmless to the (de)regulatory scheme, the only purpose served by making the statutory obligation to price in conformity with published tariffs draconian is to provide windfalls for unsecured creditors in bankruptcy. The Commission invented the filed-rate doctrine, and because the doctrine is an interpretation of reasonable practice, can modify it when changed circumstances, legal and factual, counsel modification.
 
 
 13
 The footings of this conclusion are strengthened if we attend carefully to the precise mode by which the Commission invented the filed-rate doctrine. When carriers used to sue for undercharges in cases such as this, the shipper would attempt to defend by reference to the statutory prohibition of unreasonable practices in section 1(4) of the original Interstate Commerce Act, 24 Stat. 379, now 49 U.S.C. Sec. 10701(a). The defense failed; the practice of suing for undercharges regardless of the circumstances was reasonable, given the regulatory scheme as it then existed. The regulatory scheme having changed, the practice is no longer reasonable. A standard of reasonableness, which is the standard in section 10701(a), is elastic to changed circumstances. This, the essential point in our opinion, was overlooked by the Fifth Circuit in Caravan Cargo. And in overlooking this point, the Fifth Circuit also overlooked the teachings of the Supreme Court in Chevron, U.S.A., Inc. v. National Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984), that courts are not empowered to adopt "a static judicial definition" when "Congress itself had not commanded that definition," and that if "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." The Fifth Circuit adopted a static judicial definition of the remedy for off-tariff pricing, overlooking the fact that Congress had not legislated with respect to that remedy but instead had, by use of the term reasonable in sections 10701(a) and 10704(a), confided responsibility for filling in the details of the remedial scheme to the Commission.
 
 
 14
 Although the Commission is thus empowered to modify the filed-rate doctrine, we are not. This is not only because the doctrine has been approved by the Supreme Court (which itself might invoke stare decisis against any attempt at judicial modification, Square D Co. v. Niagara Frontier Tariff Bureau, Inc., 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986)), but also and more fundamentally because we have no authority to forbid carriers' practices on the ground that they are unreasonable. Western Transportation Co. v. Wilson & Co., supra, 682 F.2d at 1231-32. The standard, the authority, is the Commission's, not the courts'. 49 U.S.C. Sec. 10704(a)(1). Chevron teaches that the Commission, as the agency charged with administering a complex and open-ended regulatory statute, has the responsibility for the details of administration, including the body of interpretive doctrines by which an agency fleshes out the bare bones ("reasonableness," "public interest," "public convenience and necessity," and so forth) of its organic statute. The filed-rate doctrine is such a doctrine. The agency that created it has rethought its position, modified a doctrine of reasonable conduct, and given plausible reasons for the modification. "[T]he Commission, faced with new developments or in light of reconsideration of the relevant facts and its mandate, may alter its past interpretation and overturn past administrative rulings and practice." American Trucking Ass'ns v. Atchison, Topeka & Santa Fe Ry., 387 U.S. 397, 416, 87 S.Ct. 1608, 1618, 18 L.Ed.2d 847 (1967). This is not a case like Continental Web Press, Inc. v. NLRB, 742 F.2d 1087, 1093-94 (7th Cir.1984), where the agency changed course without giving reasons.
 
 
 15
 We reverse so much of the district court's order as disapproved of the Commission's decision. In so doing we join the other circuits--all but the Fifth--that have passed on the question. West Coast Truck Lines, Inc. v. Weyerhaeuser Co., supra, 893 F.2d at 1027-28 (citing cases); Maislin Industries v. Primary Steel Inc., 879 F.2d 400 (8th Cir.1989), cert. granted, --- U.S. ----, 110 S.Ct. 834, 107 L.Ed.2d 830 (1990). The Supreme Court will soon resolve the conflict; Maislin is scheduled to be argued at the end of this month.
 
 
 16
 AFFIRMED IN PART, REVERSED IN PART.