911 F.2d 721
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
D.S. SWAIN GAS COMPANY, INC., Plaintiff-Appellant,
v.
DIXIE PIPELINE COMPANY, Defendant-Appellee.
 No. 89-1796.
 United States Court of Appeals, Fourth Circuit.
 Argued March 6, 1990.
Decided July 19, 1990.
Rehearing and Rehearing In Banc Denied Aug. 14, 1990.
 
 Appeal from the United States District Court for the Eastern District of North Carolina, at New Bern. Terrence W. Boyle, District Judge. (CA-87-124-4-CIV)
 Jeffrey Lee Miller, Greenville, N.C., for appellant.
 Cheryl Crandall Burke, Heron, Burchette, Ruckert and Rothwell, Washington, D.C. (Argued), for appellee; Sanford M. Saunders, Jr., Melanie T. Morris, Heron, Burchette, Ruckert and Rothwell, Washington, D.C., Glenn E. Davis, General Counsel, Dixie Pipeline Company, Bartlesville, Ok., on brief.
 E.D.N.C.
 AFFIRMED.
 Before K.K. HALL, SPROUSE and WILKINS, Circuit Judges.
 WILKINS, Circuit Judge:
 
 
 1
 D.S. Swain Gas Company, Inc. appeals the order of the district court granting summary judgment in favor of Dixie Pipeline Company on Swain's complaint alleging that Dixie violated its published tariff and North Carolina's unfair trade practices statute, N.C.Gen.Stat. Sec. 75-1.1 (1988) (North Carolina Act). We affirm.
 
 I.
 
 2
 Dixie is a common carrier pipeline company that transports propane and other petroleum products throughout the southeastern United States. The propane transported through Dixie's pipelines is owned by companies (shippers) that deliver it to Dixie for transportation to various points along the pipelines. Dixie maintains a terminal in Apex, North Carolina, where propane is received by shippers, consignees, or motor common carriers. Swain is a consignee engaged in retail sales and distribution of propane to residential, agricultural, and business consumers in North Carolina. Prior to this litigation, Swain regularly used the Apex terminal to load its tank trucks.
 
 
 3
 Dixie's Apex terminal was fully automated in 1968 eliminating the need for Dixie personnel to assist in manually loading propane into tank trucks. Under normal conditions, a truck driver enters the Dixie terminal with a key card, parks his truck at the loading rack, and enters the shipper and destination codes into a computer. The computer verifies that propane is available to the shipper, that the destination is valid, and that the driver is properly certified to operate the equipment. Computerized equipment then unlocks the pumps for loading and odorizing the propane.[1] The computer records the number of barrels loaded and issues a multi-copy, motor carrier bill of lading. The driver is not assisted by a Dixie employee during this process. The assistance of Dixie personnel is required for manual loading only when equipment malfunctions or in other unusual circumstances such as when propane is to be loaded without odorization.
 
 
 4
 Dixie charges shippers a basic fee for transporting propane through its pipelines. This fee, additional charges, and the terms and conditions under which Dixie agrees to transport propane are published in a tariff as required by the Interstate Commerce Act, 49 U.S.C.A. Sec. 10762 (West 1990), and filed with the Federal Energy Regulatory Commission. See 42 U.S.C.A. Sec. 7172 (West 1983); 18 C.F.R. Sec. 343 (1989). The fees charged by Dixie for terminal service reflect the automatic loading process. The applicable section of tariff No. 50, effective December 5, 1987, provides:
 
 
 5
 b. All shipments delivered through Carrier's tank truck loading facilities when the deliveries do not require Carrier terminal operator assistance, for any reason other than malfunction of Carrier equipment, will be assessed a service charge equal to: [20 cents per barrel.]
 
 
 6
 c. In addition to the service charge provided for in b. above, all shipments delivered through Carrier's tank truck loading facilities which require a Carrier terminal operator's assistance (for any reason other than the malfunction of Carrier equipment) will be assessed one of the following additional service charges:
 
 
 7
 1. Scheduled working hours of terminal operators will be available upon request:
 
 
 8
 If such shipments are delivered (i) during regular scheduled working hours of Carrier's terminal operators or (ii) at any other time when ... Carrier has specially scheduled terminal operator assisted service, an additional service charge will be assessed equal to: [16 cents per barrel.]
 
 
 9
 2. If such shipments are delivered at the request of a shipper at any time not included in c.1. above, an additional service charge will be assessed, equal to: [59 cents per barrel.]
 
 
 10
 Except for certifying drivers to use the automatic equipment, there have been no operator-assisted loadings at the Apex terminal since 1986.[2]
 
 
 11
 Dixie requires that users of the Apex terminal enter into a key-stop loading agreement that provides the user with access to the pipeline 24 hours per day. Under the key-stop loading agreement, a consignee is required to maintain comprehensive general liability insurance. If a consignee refuses to enter into the agreement, it is denied access to Dixie's terminal.
 
 
 12
 For several years prior to 1986, Swain participated in the key-stop loading program and entered into a key-stop loading agreement. In 1986 Swain did not renew the required insurance and withdrew from the agreement. Swain requested that Dixie provide terminal operator assistance during regular business hours at the rates provided for in the tariff. One of Swain's suppliers, Phillips 66 Company, also requested Dixie to provide Swain with terminal operator assistance. Dixie refused these requests.
 
 
 13
 Swain brought this action seeking declaratory and injunctive relief under Dixie's tariff and monetary damages for breaches of various federal and state statutes. The district court dismissed all of Swain's claims except those related to Dixie's tariff and to the North Carolina Act. Subsequently, the district court granted Dixie's motion for summary judgment on both claims. It found that the tariff is unambiguous and "only provides for terminal operator assistance when such assistance is 'required' because of certain exigencies." It also found that even if the tariff is ambiguous, Dixie's interpretation of it is a permissible, reasonable construction that conforms to the intention of Dixie and the shippers. The district court concluded that a contrary interpretation would result in commercial impracticalities unintended by Dixie. Finally, it held that there was no merit to Swain's claim under the North Carolina Act.
 
 II.
 
 14
 When a tariff is clear and unambiguous on its face, no construction by the court is necessary, and the parties are bound by its terms. Western Transp. Co. v. Wilson & Co., Inc., 682 F.2d 1227, 1231 (7th Cir.1982) ("[I]nterpretation is permitted only when the tariff is ambiguous, so that a literal reading is impossible."). When a tariff is ambiguous, the court must construe the tariff by examining the intent of the parties and "[t]he practical application of [the tariff] by interested persons." National Van Lines, Inc. v. United States, 355 F.2d 326, 333 (7th Cir.1966). Additionally, "a tariff should be interpreted to avoid unjust, absurd, or improbable results." Id. at 332. An ambiguity should not be construed against the drafter "when such construction ignores a permissible, reasonable construction which conforms to the intention of the framers of the tariff, avoids possible violations of the law, and accords with the practical application given by shippers and carriers alike." Id. at 333.
 
 
 15
 Contrary to Swain's argument that the tariff requires Dixie to provide terminal operator assistance upon request, we agree with the district court that the tariff unambiguously provides for terminal operator assistance only when it is required by certain exigent circumstances such as loading unodorized propane. Swain does not "require" terminal operator assistance for it may obtain automatic loading by executing a key-stop loading agreement.
 
 
 16
 Our conclusion that the tariff does not require Dixie to provide terminal operator assistance upon request is also consistent with the tariff as a whole. The tariff does provide for certain services upon request. For example, the tariff provision regarding storage in transit refers to "[s]hippers availing themselves of the storage in transit privilege." The tariff also provides that propane will be odorized "unless instructed in writing by the shipper not to odorize specific deliveries." When the tariff describes a service that Dixie will provide upon request, the pertinent language does not include the word "require."
 
 
 17
 Even if the tariff is ambiguous, we agree with the district court that Dixie's interpretation, providing for terminal operator assistance only when required by exigent circumstances, is a permissible, reasonable construction. See National Van Lines, 355 F.2d at 333. Moreover, other than the manual loading of Swain's trucks in April 1986 and driver certifications, there have been no loadings at the Apex terminal that required operator assistance for several years. This indicates that Dixie and the shippers have consistently applied the interpretation of the tariff urged by Dixie. In fact, for a number of years Swain operated under the terms of the tariff as interpreted by Dixie. Affidavits of Dixie personnel submitted to support the motion for summary judgment also indicate Dixie's intent to provide terminal operator assistance only when required by exigent circumstances. Additionally, in 1977, due to an increase in the number of loadings of unodorized propane requiring terminal operator assistance, Dixie's Board of Directors inserted in the tariff the provision charging an extra fee for operator-assisted loadings. It is clear that Dixie intended to provide operator assistance only when required rather than when requested.[3]
 
 III.
 
 18
 Swain concedes that if Dixie prevails on the tariff issue, its claim under the North Carolina Act fails. Because we affirm the grant of summary judgment by the district court in favor of Dixie on the tariff claim, we also affirm the grant of summary judgment on this claim.
 
 
 19
 AFFIRMED.
 
 
 20
 HALL and SPROUSE, JJ., Joined.
 
 
 
 [1]
 "Odorization" is a process by which an odorous chemical is added to propane to assist in detecting leaks
 
 
 [2]
 An affidavit of a Dixie employee indicated that in April 1986 Swain informed Dixie that its insurance had lapsed but that it was in the process of obtaining new coverage. Because there was confusion over the exact date the insurance expired, Dixie personnel manually loaded two of Swain's trucks. Except for driver certification, Swain's trucks have not been loaded manually on other occasions
 
 
 [3]
 Swain also argues that, independent of the tariff construction issue, Dixie's use of the key-stop loading agreement violated the Interstate Commerce Act. Although the complaint made reference to the Act, this argument was not properly presented to the district court and may not be raised for the first time on appeal. See McGowan v. Gillenwater, 429 F.2d 586, 587 (4th Cir.1970)